UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHN SATAWA,

                     Plaintiff,                    No. 09-CV-14190-DT

vs.                                          Hon. Gerald E. Rosen

BOARD OF COUNTY ROAD
COMMISSIONERS OF MACOMB
COUNTY, et al.,

                     Defendants.
_____/

OPINION AND ORDER ADDRESSING PLAINTIFF'S
<u>MOTION FOR PRELIMINARY INJUNCTION</u>

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on_____December 28, 2009_____

PRESENT:  Honorable Gerald E. Rosen
                       Chief Judge, United States District Court

## I. <u>INTRODUCTION</u>

Plaintiff John Satawa has filed a Motion for a Temporary Restraining

Order/Preliminary Injunction to enjoin the Macomb County Road Commission from

enforcing its decision to deny Plaintiff a permit to place a crèche and Nativity display

during the Christmas season (from November 28, 2009 to January 9, 2010) on the median

in the middle of Mound Road south of Chicago Road in Warren, Michigan.  Plaintiff

argues that the Road Commission's decision violates his First Amendment right to engage

1

in private, religious expression in a traditional public forum.  The Road Commission counters that the Mound Road median is not a traditional public forum.  The Commission further argues that, even if the median is a traditional public forum, and its decision to deny the permit does regulate protected speech, its decision serves a compelling state interest -- the Commission's statutory interest to keep public roads and rights of way reasonably safe for public vehicular traffic -- and was narrowly drawn to achieve that end.  The Commission then argues that to make an exception for the Plaintiff's Nativity scene would violate the Establishment Clause of the First Amendment.

The Court heard oral argument on Plaintiff's motion on December 9, 2009.  Following this hearing, on December 11, 2009, the Court, with the parties and their counsel, conducted a lengthy site visit to view the precise location of Mr. Satawa's proposed display and to itself drive the relevant roadways and intersections.  The Court thereafter met with the parties and counsel, outlined its specific questions and concerns, and requested supplemental filings from the parties, including stipulated facts so far as the parties could agree.  The parties complied with the Court's request, and the last of these supplemental materials was submitted on December 21, 2009.

Having reviewed and considered the parties' briefs and supporting evidence and the oral arguments of counsel, and having had the opportunity to reflect on its observations during the site visit, the Court is now prepared to rule on this matter.  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

2

THE PARTIES

Defendant Board of County Road Commissioners of Macomb County is a corporate body formed in accordance with Michigan statutory law which may sue and be sued, and may hold title to land acquired in the manner authorized by law. *See* M.C.L. § 224.9. The Board consists of three commissioners. Defendant Fran Gillett has been a Road Commissioner since 2000 and has been the Chairperson of the Board since January 2, 2008. Defendant Robert Hoepfner is the County Highway Engineer for Macomb County. Mr. Hoepfner is responsible for the supervision of road building and maintenance operations in the county under the direction of the Board. He has served in this capacity since 1995.

Plaintiff John Satawa is a resident of the City of Warren, a devout Christian, and a practicing member of the Catholic Church.

HISTORY OF MR. SATAWA'S NATIVITY DISPLAY

According to Mr. Satawa, a Nativity scene has been displayed on the public median of Mound Road at Chicago Road since 1945, when Warren was just a village. He states that in 1945, a set of Christmas statues was donated to St. Anne's Catholic Church in Warren,[1] but the figures were too large to display inside the church. Therefore, some members of the congregation, including Mr. Satawa's father, decided that it would be a good idea to display the statues and a manger in the center of the Village during the

---

[1] St. Anne's Church is located at 32000 Mound Road. [*See* 12/21/09 Stipulation regarding the testimony of Rev. Alberto P. Bondy, ¶1.]

3

holiday season.  (The 8' x 8' x8' manger for the display was built by Mr. Satawa's father and another church member, Frank Krause, with donated lumber.)  According to Plaintiff, Jack Eckstein, who was the president of the Village at the time, granted permission to display the Nativity scene on the median of Mound Road at Chicago Road and the display has been set up there every holiday season (except two)[2] since then.

Plaintiff states that the City of Warren has been aware of the display throughout the ensuing 63 years.[3]  According to Plaintiff, in the late 1970s he spoke with Thomas Marrocco, Warren's City Attorney at the time, about the Nativity display.  Plaintiff states that Mr. Marrocco told him it was permissible for him to continue displaying his Nativity scene on the public median in Warren.  Plaintiff also has submitted evidence of letters he sent to the Warren Police Department in 1995 and 1996 informing the department about the Nativity scene display and advising the department that if there was any need to contact anyone about the display, to contact him or his brother-in-law, Larry Green, whom Plaintiff states has helped him set up the display every year since his father passed away.[4] (After sending the last letter in 1995, Plaintiff claims that he received a call from a

_____

[2]  Due to major construction on Mound Road, the display was not set up in 1996 and in 2008, Plaintiff had been ordered by the Road Commission to take the crèche down because no permit had been obtained for its temporary display.

[3]  The Road Commission states that, because it does not have the financial resources to employ inspectors to drive around the county and inspect its 1,658 miles of County roads, it had no knowledge of the display until last December (2008) when it received the citizen's complaint giving rise to this action.

[4]  These letters stated as follows:

police officer telling him that the department was well aware of the Nativity scene and its

presence on the median and that, therefore, it was not necessary for Plaintiff to send any

letters in the future.)

According to Plaintiff, in 1996, an electrical outlet was installed by the Road

Commission near the location where the Nativity scene was traditionally located.

_____

December 9, 1994

Shift Commander
Warren Police Department

On Sunday, December 3, 1994, we erected the Nativity Scene at Chicago Road and
Mound.  (this has been done for the past 48 years).  It shall remain in place until Saturday,
January 07. 1995.

If there is a need to contact someone regarding this scene, please call one of the
following:

***
John F. Satawa                          Larry Green
--------------------------------------------------------------------------------------------------------------

December 4, 1995

Shift Commander
Warren Police Department

On Sunday, December 03, 1995, we erected the Nativity Scene at Chicago Road and
Mound.  (This has been done for the past 49 years)  It shall remain in place until Sunday,
January 07, 1996.

If there is a need to contact someone regarding this scene, please call on of the following:
John Satawa or Larry Green.  We would also like to be notified if the lights go out for
some reason.

Thank you in advance for your consideration.

5

Although Plaintiff asserted that this outlet was placed there for the specific purpose of making electrical power available to light his Nativity display, according to the Road Commission, this outlet was actually installed to provide power for the sprinkler system which waters the grass in the median.

THE FORM OF THE DISPLAY

Plaintiff describes in detail in his Brief the various modifications made to the display over time -- such as replacement of windows and refurbishing of the statutes -- but the dimensions of the display have not changed very much.  As displayed last year, the crèche itself is log cabin-like structure that stands 9 ½ feet high and 8' x 8' in width and depth.  (Although the physical structure of the manger is 8' x 8' x 8', the actual height of the display is 9 ½ feet as it sits on top of an 18-inch high raised platform.)  There are windows which were added in the 1950s on both the front and back of the structure so that the statues displayed within can be seen from both Mound and Chicago Roads.  The display is illuminated at night.  The crèche itself has a sign on it saying "A Blessed Christmas, St. Anne Parish."  Inside the glass-enclosed crèche is another sign reading "In Memory of Joseph and Rose Satawa."

THE SITE OF THE DISPLAY

As indicated, Mr. Satawa seeks to erect his crèche and Nativity scene on the median of Mound Road just south of Chicago Road.  [*See* 12/17/09 Stipulation of Facts, ¶ 2 and Ex. C.]  Mound Road is a certified Macomb County Road that is currently four lanes north bound, and four lanes south bound.  *Id.* ¶ 6.  The road supports over 82,600

6

cars a day and has a posted speed limit of 50 mph.  *Id.*  The road is divided by a center median which is segmented by turning lanes and intersections.  The particular median on which Plaintiff seeks to place his crèche is 60 feet wide.  *Id.* ¶ 3.  Chicago Road is a two-lane road which runs east and west and intersects Mound Road just north of the proposed crèche site.  The Mound Road - Chicago Road intersection is controlled by traffic signals in all directions on both sides of the intersection.

More specifically, Mr. Satawa's proposed site for his display on the median is approximately 25 feet from the curb, facing Chicago Road to the north.  *See id.,* Ex. C.  In front of the site is a sidewalk which adjoins the crosswalks on the north and south bound lanes of Mound Road.  *Id.* Pedestrian stop lights facing east and west are located on an electrical pole on the northeast corner of the median.  *See* Plaintiff's Exhs. P-1 through P-4. There is a stand of pine trees on the median immediately behind the proposed site. These trees are centered between the north and south bound roadways and are collectively 29 feet, 4 inches wide.  12/17/09 Stipulation, ¶ 2.  As observed by the Court, these trees are less dense in foliage on the lower branches than on the upper branches, permitting visibility, albeit somewhat diffused, of the north-bound Mound Road traffic if one is traveling east-bound on Chicago Road through the signal-controlled intersection.  *See e.g.,* Plaintiff's Ex. P-1.

On this same median island behind the stand of trees are various unattended pieces of old farming equipment and wagons.  *See* Plaintiff's Motion Ex. E.  These items are displayed by the "Friends of the Village," a private organization of local residents seeking

7

to maintain the "village" character of Warren.  *See id.*  There are also two benches for public seating -- one a wooden park bench and one a smaller concrete bench -- on this portion of the median.

On the median just north of Chicago Road, there is a small gazebo and courtyard erected by the Village of Warren Historical Commission.  This permanent display was installed in 1982 when the State of Michigan Historical Society erected a Historical Site Marker honoring the former Village of Warren.  *See* Hoepfner Affidavit, Defendant's Ex. B ¶ 33 and Exhs. F-H.]  The Road Commission permitted the permanent installation but on condition that the City of Warren indemnify and hold the Commission harmless through a Warren City Resolution accepting the liability and providing indemnification. [Hoepfner Aff., ¶ 34.]  The City of Warren currently insures this historic site with a $5 million insurance policy.  *Id.* ¶ 37; Defendant's Ex. I.  The Court's observation was that the gazebo and courtyard are situated and structured in such a way that visibility of south-bound Mound Road traffic is not obscured if one is traveling west-bound on Chicago Road through the signal-controlled intersection.

REMOVAL OF THE NATIVITY DISPLAY IN DECEMBER 2008

In December 2008, the Road Commissioners received a letter, ostensibly written "on behalf of a concerned Macomb County resident" objecting to the Nativity display on the ground that it violated the fundamental principle of separation of church and state. The "concerned Macomb County resident" is not identified in this letter, which was written on the letterhead of the "Freedom from Religion Foundation" and signed by a

8

Foundation "Staff Attorney." The letter complained that placement of the crèche on

county property and illuminated by the use of electricity being provided by the

municipality, constituted a constitutionally impermissible government endorsement of

and entanglement with a particular religious message. [*See* Defendants' Ex. E.][5]

_____

⁵ The letter, dated December 10, 2008, stated as follows:

Dear Commissioners:

I am writing on behalf of a concerned Macomb county resident, who objects to the
erection and maintenance of a nativity scene on County property. Freedom From
Religion Foundation (FFRF) is a national nonprofit organization based in Madison,
Wisconsin with over 13,000 members across the country. Our purpose is to protect the
fundamental constitutional principle of separation of church and state.

It is our information and understanding that a nativity scene has been erected in the
median at the intersection of Mound Road and Chicago Road in the city of Warren. Our
complainant informs us there is a sign inside the glass-enclosed crèche that reads "In
Memory of Joseph and Rose Satawa." Additionally, there is a wooden sign that states "A
blessed Christmas, St. Anne Parish."

It is unlawful for the Road Commission of Macomb County to maintain, erect, or host a
holiday display that consists solely of a nativity scene, thus singling out, showing
preference for, and endorsing one religion. The Supreme Court has ruled it is
impermissible to place a nativity scene as the sole focus of a display on government
property. *See Allegheny v. ACLU of Pittsburgh*, 492 U.S. 1989; *Lynch v. Donnelly,* 465
U.S. 668 (1983).

In *County of Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573 (1989), the Supreme Court
held that a county government's crèche displayed in the county courthouse was an
unconstitutional endorsement of religion. The Court stated,

> "Lynch v. Donnelly, confirms, and in no way repudiates, the longstanding
> constitutional principle that government may not engage in a practice that
> has the effect of promoting or endorsing religious beliefs. The display of
> the crèche in the county courthouse has this unconstitutional effect. *Id.* at
> 621.

_____

The Court further determined that the placement of the crèche on the Grand Staircase of the county courthouse contributed to its illegality because "no viewer could reasonably think it occupies this location without support and approval of the government."  *Id.* at 599600.  Moreover, the Court found that the nativity scene "sen[t] an unmistakable message that 'the county] supports and promotes the Christian praise to God that is the crèche's religious message."  *Id.* at 601.

It is irrefutable that the crèche is a religious, Christian symbol.  *See Lynch v. Donnelly*, 465 U.S. 668, 711 (1984) (Brennan, J. Dissenting) (stating that the crèche is a "recreation of an event that lies at the heart of the Christian faith").  Displaying an inherently Christian message at a busy intersection on County-owned property unmistakably sends the message that Macomb County endorsed the religious beliefs embodied in the display.  When the County displays this manger scene, which depicts the legendary birth of Jesus Christ, it places the imprimatur of the Macomb County government behind the Christian religious doctrine.  This excludes citizens who are not Christians -- Jews, Native American religion practitioners, animists, etc., as well as the significant and growing portion of the U.S. population that is not religious at all [14% of adults], including complainants and taxpayers in your county.

The constitutional concerns are not alleviated simply because the crèche is erected and/or owned by St. Anne Parish.  The Supreme Court stated in Allegheny,

> "[t]he fact that the crèche bears a sign disclosing its ownership by a Roman Catholic organization does not alter this conclusion.  On the contrary, the sign simply demonstrates that the government is endorsing the religious message of that organization, rather than communicating a message of its own.  But the Establishment Clause does not limit only the religious content of the government's own communications.  It also prohibits the government's support and promotion of religious communications by religious organizations."  *Id.*

There is further government entanglement because the illumination of the display is presumably provided by the city.

There are ample private and church grounds where religious displays may be freely placed, including, presumably, St. Anne's Parish, where this display clearly belongs.  Once the government enters into the religion business, conferring endorsement and preference for one religion over others, it strikes a blow at religious liberty, forcing taxpayers of all faiths and of no religion to support a particular expression of worship.

As a result of this complaint, the Road Commission dispatched an employee to the intersection of Mound and Chicago Roads to locate the complained of crèche.  [Hoepfner Aff. ¶ 18.]  Based upon the observation of the size and strength of the crèche, as well as its location in the median close to the intersection, it was determined that the crèche posed a significant danger to public safety, and that, as a result, the Commission could not allow this encroachment on the Mound Road median.  *Id.* ¶ 21.

The next day, December 11, 2008, County Highway Engineer Hoepfner sent Mr. Satawa a letter directing him to remove the Nativity display.  *Id.* ¶ 22.  This letter stated:

> Dear Mr. Satawa:
>
> It has come to the attention of the Road Commission of Macomb County that you have installed a temporary structure in the median of Mound Road south of Chicago Road in the City of Warren.  A search of our records indicates that no permit was issued for this structure to be placed in the Road Commission right of way.
>
> This letter serves as your notice to immediately remove the structure from the right of way.  If removal does not occur within 30 days of the receipt of

---

We ask that you immediately phone St. Anne's Parish to have them remove the display to private property.  May we hear from you immediately about the steps you are taking to remedy this violation?

Sincerely,

/s/
Rebecca S. Kratz
Staff Attorney

11

this letter, the Road Commission forces will remove the structure and bill
you for the costs incurred.

If you have any questions regarding this matter, please feel free to contact
me.

Sincerely,

/s/
Robert P. Hoepfner, P.E.
County Highway Engineer

[*See* Plaintiff's Ex. C.]

Plaintiff complied with this directive and removed the Nativity scene.

In January 2009, Plaintiff went to the Road Commission office and filled out a

permit application for the display of the Nativity scene.  On February 7, 2009, Plaintiff

received a letter from the Road Commission with a blank copy of a permit application

enclosed.  The letter indicated that the application Plaintiff had previously submitted in

January was "incomplete."  [*See* Plaintiff's Ex. D.]  Thereafter, Plaintiff, this time

through counsel, re-submitted his application setting forth the details of his proposed

Nativity display and included with the application photographs showing the size and

precise location of the display from various angles, purportedly to show that the display

would not obstruct any vehicular or pedestrian traffic or create any public safety issues.

In his permit application Plaintiff stated as follows:

Applicant, Mr. John Satawa, requests permission to temporarily display a
Nativity Scene in the median of Mound Road south of Chicago Road in the
City of Warren for a period beginning on November 28, 2009 and ending
on January 9, 2010.  Applicant's display is intended to be an exercise of his
private religious speech, which is fully protected under the Free Speech

12

Clause of the First Amendment.

The proposed Nativity Scene is approximately 8' x 8' x 8' at the peak, and it will be displayed in a manner similar to how it has been displayed at this location for the past 60 years.  The enclosed photographs which were taken of the display in January 2009, illustrate the nature, size, and location of the proposed display.  As demonstrated by the photographs, there are no obstructions to vehicular or pedestrian traffic or any other safety concerns caused by the display.

The proposed display will be lighted by two 150W floodlights and two 100W light bulbs.  There is an electrical outlet available at the median location that has been used in previous years to provide power for the display.  Applicant will pay for all electrical costs associated with his display.  Additionally, applicant will be responsible for putting up and taking down the display.  No assistance from government employees will be required.

Please advise if any insurance will be required, the reasons for said insurance, and the amount.  Applicant is willing to pay all *reasonable* costs associated with his temporary display.  Applicant is also willing to post a sign at the display which clearly states that it is his private display and not the display of Macomb County, the City of Warren, or any other government entity.  Applicant is willing to coordinate and cooperate with Macomb County on the content, size and location of the sign.

[Plaintiff's Ex. I (emphasis in original).]

In the cover letter which accompanied Plaintiff's application, Plaintiff requested that "[s]hould the permit application be denied, we respectfully request that you notify us of this in writing, stating the reason(s) for the denial."  *Id.*

The Commission addressed Mr. Satawa's permit application during its March 6, 2009 meeting.  Hoepfner Aff., ¶ 26.  The Commission authorized Hoepfner to deny the permit based on Commission policies and safety concerns.  *Id.*

On March 9, 2009, Mr. Hoepfner sent Plaintiff's attorney a letter formally denying

13

Plaintiff's application for a permit for his display.  The denial letter stated as follows:

Dear Mr. Muise:

Please allow this letter to serve as the Board of County Road Commissioners for the County of Macomb's formal denial of the January 7, 2009 Application for Permit submitted by John Satawa to erect a nativity scene in the Mound Road right of way.  Given the religious nature of your nativity scene, the Road Commission of Macomb County as a governmental agency must weigh whether or not the approval of such a permit would be deemed a violation of the First Amendment of the United States Constitution.

A statute or practice that touches on religion, if it [is] to be permissible under the establishment of religion clause of the Constitution's First Amendment, (1) must have a secular purpose, (2) must neither advance nor inhibit religion in its principal or primary effect, and (3) must not foster an excessive entanglement of government with religion.  In *Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573 (1989), the U.S. Supreme Court held that "there is no doubt, of course, that the crèche (nativity scene) itself is capable of communicating a religious message."

Since the nativity scene Mr. Satawa desires to place in the right of way clearly displays a religious message, this would be a violation of the Establishment Clause of the First Amendment.  "*Establishment Clause*, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making any adherence to a religion relevant in any way to a person's standing in the political community.'" *Allegheny*, at 594.

The Road Commission of Macomb County cannot permit you to display this nativity scene in the Road Commission's right of way.  This undoubtedly would be interpreted as our endorsement of religion, in violation of the *Establishment Clause of the U.S. Constitution*.

Thank you for your attention to this matter.  Please do not hesitate to contact me with an questions or concerns.

Sincerely,
/s/
Robert P. Hoepfner, P.E.

14

County Highway Engineer

Defendant Hoepfner states that since Mr. Satawa's permit application expressly addressed his claims of religious expression in the median, the Commission's denial letter addressed this aspect of the application. *Id.* ¶ 31. Hoepfner states that since the Commission had already determined when it sent Mr. Satawa the letter dated December 11, 2008 that the structure was a significant danger to public safety and reached the same conclusion when it considered his application in 2009, he viewed Satawa's "freedom of religious expression" application as seeking an exception to the Commission's general policy of not allowing private installations in the medians of major highways and primary roads, and so, addressed only that issue in his denial letter. *Id.* ¶¶ 30-31.

On October 23, 2009, Plaintiff instituted this Section 1983 action, and on October 30, 2009, Plaintiff filed the instant Motion for Temporary Restraining Order/Preliminary Injunction.

<u>ANALYSIS</u>

A.    <u>STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF</u>

In deciding whether a plaintiff is entitled to a preliminary injunction, the court is to utilize the traditional four-factor test for injunctive relief:

(1)    The likelihood of plaintiff's success on the merits; and
(2)    Whether the injunction will save the plaintiff from irreparable injury;
(3)    Whether the injunction will harm others; and
(4)    Whether the public interest will be served by the injunction.

*Sandison v. Michigan High School Athletic Association, Inc.*, 64 F.3d 1026, 1030 (6th

15

Cir. 1995). *See also, Superior Consulting Company, Inc., v. Walling, supra*, 851 F. Supp.

839, 846 (E.D. Mich. 1994). These factors should be balanced and are not considered

prerequisites that must be met. *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th

Cir. 1992). "These factors simply guide the discretion of the court; they are not meant to

be rigid and unbending requirements." *Id.*

 Before turning to its analysis of these factors, the Court observes that the factual

underlayment of this case -- most of which is stipulated by the parties -- makes this one

that is not only unique to its facts, but is also an extremely close case at a number of

critical intersections of fact and law. The analysis which follows is, therefore, narrow and

reflects the uniqueness and closeness of these factual and legal issues. Finally, the Court

wishes to thank the parties and counsel for the manner in which they have assisted the

Court, and worked with each other, in presenting this challenging case which is so

obviously important to them and their community. This is one of those relatively rare

cases which the Court wishes it could fashion a decision that would fully accommodate

the interests and objectives of both sides, as they are all laudable. Unfortunately, it

cannot.

1. <u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>

<u>PLAINTIFF'S FREEDOM OF SPEECH CLAIM</u>

 Plaintiff contends that the Road Commission's denial of his application to display

his Nativity scene in the Mound Road median violated his First Amendment right to

freedom of speech. Defendants do not dispute that the display of a Nativity scene is an

act of constitutionally protected religious expression.  *See Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573, 598, 109 S.Ct. 3086, 3103 (1989).  The Defendants do, however, contend that the Constitution does not protect Plaintiff's attempt to display his Nativity scene in the Mound Road median.

As noted, Defendants argue in opposing Plaintiffs' motion for injunctive relief that (1) the median in the center of Mound Road is not a traditional public forum and (2) even if it is, the Defendants had a compelling state interest, to-wit, its statutory responsibility to keep Mound Road reasonably safe for public vehicular travel and to avoid damage or danger caused by installations in the right-of-way that create a hazardous condition for the motoring public.[6]  This interest, Defendants argue, is sufficient to satisfy the strict

---

[6] Defendants also cursorily argue in a few brief paragraphs of their initial opposition brief that to allow Plaintiff to erect his temporary Nativity display would give the appearance of the County's endorsement of religion, and thus, constitute a violation of the Establishment Clause.

However, avoidance of an Establishment Clause violation cannot serve as justification for denying a permit to erect a religious display in a public forum.  This issue was addressed by the Supreme Court in *Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440 (1995), a case out of the Sixth Circuit.

In *Pinette*, the plaintiffs sought a permit to erect a cross for Christmas on Capitol Square in Columbus, Ohio.  Capitol Square has long been used for public gatherings and cultural festivals and during the holiday season, the square has been decorated with lights, a Christmas tree and a menorah.  The Capitol Square Review and Advisory Board, which has, by Ohio statute, the sole authority to regulate uses in the square, denied the plaintiffs' permit application "upon the advice of counsel, in a good faith attempt to comply with the Ohio and the United States Constitutions."  *See Pinette v. Capitol Square Rev. and Adv. Bd.*, 30 F.3d 675, 676 (6th Cir. 1994).  Specifically, the Board contended that the permit had been denied to avoid a violation of the Establishment Clause because the location of this distinctly religious display in front of the Ohio Statehouse and on Capitol Square

17

scrutiny given to content-based restrictions in public fora.

FORUM ANALYSIS

Is the Median in the Center of Mound Road a "Traditional Public Forum"?

"It is undeniable, of course, that speech which is constitutionally protected against

state suppression is not thereby accorded a guaranteed forum on all property owned by

the State." *Capitol Square Review and Advisory Bd. v. Pinette*, *supra*, 515 U.S. at 761,

───────────────

would lead a reasonable observer to conclude that the State of Ohio endorsed Christianity.
The District Court, the Sixth Circuit and the Supreme Court all rejected that argument.
As the Supreme Court explained:

> The State did not sponsor respondents' expression, the expression was
> made on government property that had been opened to the public for
> speech, and permission was requested through the same application process
> and on the same terms required of other private groups.

> * * *

> Our cases have. . . equated "endorsement" with "promotion" or
> "favoritism."  We find it peculiar to say that government "promotes" or
> "favors" a religious display by giving it the same access to a public forum
> that all other displays enjoy. * * *  Where we have tested for endorsement
> of religion, the subject of the test was either expression *by the government
> itself*, or else government action alleged to *discriminate in favor of* private
> religious expression or activity.  the test petitioners propose, which would
> attribute to a neutrally behaving government *private* religious expression,
> has no antecedent in our jurisprudence. . . .

515 U.S. at 763-64, 115 S.Ct. at 2447-48 (citations omitted; emphasis in original).

If the median is a non-public forum, however, "the interest of the State in avoiding
an Establishment Clause violation may be a compelling state interest justifying an
abridgment of free speech."  *Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*,
508 U.S. 384, 394, 113 S.Ct. 2141, 2148 (1993).  *See also Ashby v. Isle of Wight County
School Bd.*, 354 F. Supp. 2d 616, 629 (E.D. Va. 2004).

18

115 S.Ct. at 2446, (citing *Postal Service v. Council of Greenburgh Civic Ass'ns.*, 453 U.S. 114, 129, 101 S.Ct. 2676, 2685 (1981)); *Perry Ed. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954 (1983). The right to use government property for one's private expression depends upon whether the property has by law or tradition been given the status of a public forum. *Pinette, supra*; *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 802-803, 105 S.Ct. 3439, 3449 (1985).

For forum analysis purposes, government property has been divided into three categories: traditional public fora, designated (or "limited") public fora, and non-public fora. *See Cornelius v. NAACP Legal Def. & Educ. Fund, supra*, 473 U.S. at 800, 105 S.Ct. at 3449. Public fora generally are those "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954. A second category of public fora consists of "public property which the State has opened for use by the public as a place for expressive activity." *Id.*, 460 U.S. at 45, 103 S.Ct. at 955. *See, e.g., Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269 (1981) (university meeting facilities); *City of Madison Joint School Dist. No. 8 v. Wisconsin Empl. Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421 (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239 (1975) (municipal theatre). This type of public forum has been called a "limited public forum" or a "public forum by designation." *San Diego Committee Against Registration and the Draft (CARD) v. Governing Bd. of Grossmont*

19

*Union High School Dist.*, 790 F.2d 1471, 1475 (9th Cir.1986). "A limited public forum may, depending upon its nature and the nature of the state's actions, be open to the general public for the discussion of all topics, or there may be limitations on the groups allowed to use the forums or the topics that can be discussed." *Id.*

Streets and parks are traditional public fora. The Supreme Court "long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks, which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove City, Utah v. Summum*, ___ U.S. ___, 129 S.Ct. 1125, 1131 (2009) (quoting *Perry Ed. Ass'n. v. Perry Local Educators' Ass'n*., 460 U.S. at 45, 103 S.Ct. 948 (quoting *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515, 59 S.Ct. 954 (1939))). In order to preserve this freedom, government entities are strictly limited in their ability to regulate private speech in such "traditional public fora." *Pleasant Grove, supra*; *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc*., 473 U.S. at 800, 105 S.Ct. 3439. Although reasonable time, place, and manner restrictions are allowed, see *Perry Ed. Assn., supra*, at 45, any restriction based on the content of the speech must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government interest, *see Cornelius, supra*, at 800, 105 S.Ct. 3439, and restrictions based on viewpoint are prohibited, *see Carey v. Brown*, 447 U.S. 455, 463, 100 S.Ct. 2286

20

(1980).[7]

While Defendants acknowledge that, generally, streets may constitute traditional public fora, they argue that a *median in the center of a major traffic artery while the road is in use by vehicular traffic* is not a "traditional public forum." Unfortunately, the cases are not uniform, and this particular median, given its unique characteristics, does not find a comfortable fit in any case law -- much less applicable precedent -- which the parties have cited or which the Court has been able to find on its own.

For example, in addressing a challenge to an anti-picketing ordinance in *Frisby v. Schultz*, 487 U.S. 474, 108 S.Ct. 2495 (1988), the Supreme Court rejected the defendants' argument that narrow streets in a residential neighborhood should not be deemed to be a "traditional public forum," stating very broadly:

> [O]ur decisions identifying public streets and sidewalks as traditional public fora are not accidental invocations of a "cliché." but recognition that wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public. No particularized inquiry into the precise nature of a specific street is necessary; **all public streets are held in the public trust and are properly considered public fora**. Accordingly, the streets of Brookfield are traditional public fora. The residential character of those streets may well inform the application of the relevant test, but it does not lead to a different test; the antipicketing ordinance must be judged against the stringent standards we have established for restrictions on speech in traditional public fora[.]

_____

[7] These same standards apply to limited public fora. *Perry Educational Ass'n*, 460 U.S. at 45, 103 S.Ct. at 955. Plaintiff, however, does not contend that the Mound Road median is a "limited public forum." Rather, his position is that it is a "traditional public forum."

487 U.S. at 480-81, 108 S.Ct. at 2500 (citations and some internal punctuation omitted; emphasis added).

However, the speech at issue in *Frisby* was picketing on a public interest issue (the plaintiffs wanted to picket on the street outside an abortion doctor's house with anti-abortion signs), and as the Supreme Court noted, "uninhibited, robust and wide-open debate on public issues" strikes "at the core of the First Amendment," 487 U.S. at 479, 108 S.Ct. at 2499, and public-issue picketing traditionally takes place on public streets.

On the other hand, a similar argument for limiting the "public forum" classification of public streets was made by the defendants, and recognized by the Ninth Circuit, in *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986). In that case, the plaintiffs challenged a Phoenix city ordinance which prohibited soliciting contributions from occupants of vehicles stopped at intersections. ACORN argued broadly that the city streets constituted a traditional public forum, particularly suited for public expression, which could not be closed to First Amendment activities. The defendants disputed plaintiffs' premise. While the court acknowledged that public streets were "the prototypical example of a public forum" when a party would seek access to the streets for a parade or other demonstration, it refused to concede that a street might have such a public forum character at all times:

> To conclude that the streets may generally be categorized as traditional
> public fora may not require us to also conclude that the streets at all times
> and under all circumstances are susceptible to characterization as a
> perpetual public forum uniquely available for free expression. The district
> court ruled, "Clearly, by long tradition or government fiat' such areas

22

[streets] are not designated as forums for public communication *while in use by vehicular traffic*."  605 F. Supp. at 871.

As a practical matter, there are indeed substantial differences in nature between a street, kept open to motorized vehicle traffic and a sidewalk or public park.  A pedestrian ordinarily has an entitlement to be present upon the sidewalk or on the grounds of a park and thus is generally free at all times to engage in expression and public discourse at such locations.  This is obviously not true of streets continually filled with pulsing traffic.  Consequently, more so than with sidewalks or parks, courts have recognized a greater governmental interest in regulating the use of city streets. [Citation omitted.]

798 F.2d at 1266-67.

The *ACORN* court, however, found it unnecessary to decide whether public streets are "perpetual public fora" because it found the ordinance justified even under the more rigorous standards applied to regulation of expression in traditional public fora.  *Id.* at 1267.  Consequently, the court declined to express any opinion as to the validity of the defendants' argument that streets are not public fora while simultaneously in use by motor vehicles.  *Id.*   Defendants here have relied upon the *ACORN* decision but, unfortunately, neglected to state in their brief that the court never decided the issue.

By the same token, Plaintiffs repeatedly and erroneously included "medians" in citing to Supreme Court cases stating that streets and sidewalks are traditional public fora, though medians are not mentioned in any of those decisions.  The only case cited by Plaintiffs in which medians are even mentioned is *Goedert v. City of Ferndale*, 596 F. Supp. 2d 1027, 1032 (E.D. Mich. 2008) (Hood, J.), the "honk if you are opposed to the war" case.  In that case, the intersection of 9 Mile and Woodward in the City of Ferndale

23

was used every Monday for five years for a "vigil" by demonstrators protesting the war in

Iraq who would display signs reading "Honk for Peace," or "Honk if you want Bush out,"

and cars passing through the intersection would honk their horns in response. The weekly

vigil proceeded without incident for several years until one weekend, the demonstration

got out of hand. "Demonstrators [who] were on every corner of the intersection, the

sidewalks, and *alongside the median* [became] unruly and were causing a safety hazard

by leaning into traffic with their signs." 596 F. Supp. 2d at 1029. (Emphasis added.)

Police concluded that the honking of vehicle horns was a distraction that could lead to

safety problems. *Id.* They, therefore, began enforcing Ferndale's disturbing of the peace

ordinance and another city ordinance which incorporated a state statute that prohibited

honking of horns except to warn of a traffic hazzard. *Id.* After the plaintiffs were

ticketed for violating the city ordinance, they filed suit claiming violation of their right to

freedom of speech.

In analyzing the plaintiffs' free speech claim in *Goedert*, the court found the

*intersection* of Woodward and 9 Mile to be a traditional public forum:

> Woodward and 9 Mile is in the heart of downtown Ferndale. (Pl. Mot.
> Summ. Judgment, Ex. 14, p. 50.) It is one of the busiest intersections in
> Ferndale, second only to Woodward and Eight Mile in the volume of traffic.
> (Pl. Mot. Summ. Judgment, Ex. 9, pp. 80:16-81:1.) There is typically
> significant traffic noise during the time of the Vigil. The intersection of 9
> Mile and Woodward is properly characterized as a public forum for a First
> Amendment analysis.

596 F. Supp. 2d at 1032.

However, there is no discussion in the case of public use of any median in the

24

roadway.  The only mention of the word "median" in the opinion was, in passing, the court noted that on one weekend, demonstrators "were on every corner of the intersection, the sidewalks, and *alongside the median*," which could well mean that they were actually in the street.

A closer case to the instant case was presented in *Snowden v. Town of Bay Harbor Islands, Florida*, 358 F. Supp. 2d 1178 (S.D. Fla. 2004).  There, the plaintiff requested permission to place a Nativity scene on a grassy median dividing a state road.  When the Town of Bay Harbor denied her request, she filed suit seeking declaratory and injunctive relief.  In deciding the plaintiff's request for a preliminary injunction, the court undertook a forum analysis and concluded that the median on which plaintiff sought to erect her display was **not** a traditional public forum, despite the plaintiff's characterization of it as such.  The court reasoned:

> It is not a traditional park or area where people congregate, gather, and traditionally have a free exchange of ideas and speakers, with appropriate accommodations facilitating such use, such as public restrooms and public parking. This grassy area is more appropriately what Defendants have represented it to be, a rather small green space abutting two roadways, with no buffers such as sidewalks for protection or apparent invitation to the public.  It does not present the physical characteristics of a park beyond the presence of grass, and is not associated with or near a seat of legislative or executive power. *Cf. Warren v. Fairfax County*, 196 F.3d 186 (4th Cir.1999). Although technically open to the public, it does not function as a traditional or "quintessential" public forum. *See, e.g.,* [*United States v.*] *Kokinda*, 497 U.S. [720,] 728-29, 110 S.Ct. 3115 ("[T]he dissent is simply incorrect in asserting that every public sidewalk is a public forum. Post, at 3129-3130. As we recognized in [*United States v.*] *Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) ], the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum.").

25

358 F. Supp. at 1193.

Therefore, the lesser "rational basis" standard of scrutiny applied to the municipality's denial of Snowden's request.[8]

By contrast, in *Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 1999) (*en banc*), the Court found that the Center Island mall in front of the Fairfax County Government Center Complex was more of a park than a median as argued by the defendants (and as found by the majority of the original appellate panel), and therefore, was a public forum.

> Sidewalks circumnavigated the mall and ran through a central landscaped strip. The area of the mall abutting the Government Center Complex features a circular brick promenade complemented by additional landscaping. Surrounding the mall is the street which leads to the Government Center Complex. The entire mall is outdoors, unenclosed, publicly accessible, and in fact open to the public.

*Id.* at 188. From these features, the Court found that

> The Center Island mall has the objective use and purpose of a traditional public forum. Its objective use is as a place of open public access, which is eminently compatible with expressive activity.
>
> Finally the Center Island mall is part of a class of property which by

---

[8] For non-public fora, the government's decision must be reasonable and "not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Ed. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 46, 103 S.Ct. 948, 955 (1983). Indeed, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 475 U.S. 788, 806, 105 S.Ct. 3439, 3451 (1985). In *Snowden*, the court ultimately found that the municipality's denial could not pass muster under this lesser standard of scrutiny because it had previously allowed other religious displays (i.e., a display of a menorah during Chanukah) on this property and therefore, it could not be said that the denial of permission to erect a crèche was "viewpoint neutral."

history and tradition has been open and used for expressive activity. The
Center Island mall is part of the outdoor grounds of a seat of legislative
and/or executive power.

*Id*. at 189-90.[9]

---

[9] Adopting the original appellate panel's dissenting opinion, the *Fairfax County en
banc* court, however, stated in dicta, that even if it were to agree with the original panel's
majority determination that the Center Island mall was only a landscaped median, it
would disagree with the majority's conclusion that median strips should not be viewed as
traditional public fora, stating:

Neither the district court nor the majority cited to any authority supporting
their novel attempt to carve out an exception from the public forum doctrine
for property that, quite literally, lies at the heart of the Supreme Court's
quintessential example of the traditional public forum. If streets, sidewalks
and parks are traditional public fora, then a court bears a heavy burden in
explaining why property which is merely a combination of all three from
the standpoint of physical characteristics, objective uses and purposes, and
traditional and historic treatment, is not. Median strips, like sidewalks, are
integral parts of the public thoroughfares that constitute the traditional
public fora. In many cases, median strips house sidewalks. If a person who
is rightfully on a street or sidewalk left open to the public "carries with him
there as elsewhere the constitutional right to express his views in an orderly
fashion," *Jamison v. Texas*, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869
(1943), I do not see how the person loses that right merely by stepping onto
the median. Nor does the general public. Consistent with the median strip's
function as part of the public thoroughfares traditionally open to the public
for expressive activities, people have been engaging in such activity on
median strips for as long as median strips have been in existence.
Newspaper criers, local civic fundraisers, members of political campaigns,
religious groups, and people with a message have often chosen median
strips, with their ready access to the bustle of undifferentiated humanity, as
their preferred launching point for expressive conduct.

196 F.3d at 196 (footnote omitted.)

The *en banc* court, however, excepted from its "public forum" view of medians
median strips on interstates and similarly cordoned off expressways, which
by their nature are not generally accessible to pedestrians. The Center

27

As these cases reflect, there are few clear lines of demarcation in cases in which streets, medians and vehicular traffic coincide to create a potential conflict between free speech interests and public safety concerns.  And, this case presents even more conflicting considerations -- and fewer clear lines of demarcation -- than most, as the median at issue here bears compelling indicia of both a public and a non-public forum.  On the pubic forum side, the median has one sidewalk used by pedestrians in crossing the median, and there are a couple of benches for public seating placed with the "Village of Warren" farm instruments display behind the stand of pine trees.  And, at 60 feet in width, it is wider than most medians.

On the non-public forum side, it is a median in the center of a major eight-lane roadway with traffic at times reaching relatively high rates of speed, and with a busy intersection.  Surely, such a median cannot be a place intended for bringing citizens together to exchange ideas, which, of course, is at the core of the "public forum" designation.  A traditional public forum is a public place where, by long history, the public has gathered to speak, debate, and exchange ideas.  *See Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. 948.  It is those "'[p]ublic places' historically associated with free exercise of expressive activities, such as streets, sidewalks and parks, that are considered,

---

Island mall is not such a median strip as evidenced by the sidewalks around its circumference.

*Id*. at n. 9.

without more, to be 'public forums.'" *United States v. Grace*, 461 U.S. 171, 177, 103

S.Ct. 1702 (1983); *see also Frisby v. Schultz, supra* (holding that residential streets are

traditional public fora).  Such places are considered traditional public fora because they

"have immemorially been held in trust for the use of the public and, time out of mind,

have been used for purposes of assembly, communicating thoughts between citizens and

discussing public questions."  *Perry*, 460 U.S. at 45.  Indeed, the Supreme Court "has

rejected the view that traditional public forum status extends beyond its historical

confines." *Arkansas Educ. Television Ass'n v. Forbes*, 523 U.S. 666, 668, 118 S.Ct. 1633,

1641 (1998).

It cannot be said that the median on which Plaintiff wants to set up his display is

used for public discourse and debate such as Capitol Square is in Columbus, Ohio or

Calder Plaza in Grand Rapids, Michigan, *see Americans United for Separation of Church

and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992) (private organization's

display of Menorah on a plaza used for all forms of speech and assemblage).  Nor is it

property that the City of Warren or Macomb County has dedicated to commemorating the

"people, ideals, and events that compose [the city's or county's] identity" with numerous

permanent monuments and historical markers, as was the case in *Van Orden v. Perry*, 545

U.S. 677 (2005) (upholding display of the Ten Commandments as one of 17 monuments

on the 22-acre park surrounding the Texas State Capitol).

When public property is not characterized as a public forum, the government may

reserve the forum for its intended purposes.  *Perry Educational Ass'n, supra*, 460 U.S. at

29

46, 103 S.Ct, at 955; *Adderley v. Florida*, 385 U.S. 39. 47, 87 S.Ct. 242, 247 (1966)

("The State, no less than a private owner of property, has power to preserve the property

under its control for the use to which it is lawfully dedicated.")

As the Ninth Circuit ultimately concluded in the *ACORN* case, however, it is

unnecessary for the Court here to decide whether or not a median in the center of a

heavily traveled road is a public forum because the Road Commission's decision is

justified even under the strict scrutiny standards applied to the regulation of speech in

traditional public fora.

THE COUNTY HAS A COMPELLING STATE INTEREST IN PROHIBITING THE
PLACEMENT OF THE CRÈCHE IN THE MEDIAN.

As indicated, speakers and speech may be excluded from a public forum when "the

exclusion is necessary to serve a compelling state interest and the exclusion is narrowly

drawn to achieve that interest." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,*

*supra*, 473 U.S. at 800, 105 S.Ct. 3439.

The Road Commission maintains that it had a compelling state interest in denying

Plaintiff's application for a permit for his temporary Nativity display, that interest being

to keep the county roads safe for vehicular travel.[10]  In furtherance of this interest, the

--------

[10]   As indicated above, Defendants did not originally give Plaintiff traffic safety as
a reason for denying his permit.  Defendants have presented evidence, however, that they
had already decided that Plaintiff's crèche posed a traffic safety hazard at the time they
sent him the denial letter but only addressed in the letter the violation of the First
Amendment's Establishment Clause they believed would result if they granted the permit
because Plaintiff had focused on his First Amendment rights in submitting his application.

Commission's policy is to prohibit the installation of private structures and encroachments in the medians of primary roads and major highways.  Mound Road is a primary Road, with eight lanes, where 82,600 cars travel daily at speeds near or in excess of 50 miles per hour.  Because of the size and strength of Mr. Satawa's crèche structure and its proposed location near the intersection of Mound Road and Chicago Road, Defendants state that the crèche posed a significant safety hazard.  "Plaintiff's structure itself, regardless of content, could be struck by a vehicle traveling down Mound Road or in the intersection and cause serious damage not only to a traveling vehicle but also any passengers in a vehicle."  As the Court observed, however, this "danger of being struck by a vehicle" justification is purely speculative and, in fact, based upon the Court's own observations from driving both Mound and Chicago Roads in both directions and transgressing the intersection from all directions, the Court can safely and readily conclude that -- with one singular, but potentially dangerous exception -- most of the traffic safety argument proffered by Defendants are either very remote or highly speculative, or both.

However, again based upon its own observations, the Court does find that Defendants' additional justification -- that the structure and display could impede site lines at the intersection -- has some merit. As Mr. Hoepfner explained, "Roadside control is necessary to improve highway safety, to maintain or improve site line distances and expedite the free flow of traffic."  [Affidavit of Robert Hoepfner, ¶ 6, Defendants' Ex. B.] The Michigan Road Design Manual, which is the Commission's regulatory guide, also

31

states that "a flat, smooth, unobstructed area adjacent to the driving lanes. . . significantly improves highway safety."  [Michigan Road Design Manual at Reg. 7.01.11, Defendants' Ex. C.]

Based upon the Court's personal observation of the proposed site of the crèche without the crèche present, and having viewed photographs of the site lines when the crèche was on the site, the Court finds that the crèche could obstruct the view of motorists driving east-bound on Chicago Road of traffic traveling north bound on Mound Road causing a potentially significant safety risk where persons traveling east on Chicago are racing to make it through the traffic light at the intersection and attempting to determine if there is on-coming traffic from their right on north-bound Mound Road.  As noted, the Court drove and observed the site without the crèche erected, and while the Court acknowledges that the stand of trees might inhibit a driver's sight line to a limited extent, because the foliage on the lower branches of the trees -- particularly those closest to the northeast corner of the site -- is not very dense, a driver still can see reasonably well cars traveling northbound on Mound Road with sufficient time before they get to the intersection to make a determination and avoid a potential collision.  The crèche, however, placed on its proposed site, would significantly obstruct that view and, thereby, create a potential, but serious safety hazard.[11].

---

[11]  The Court further notes, again based upon its observations in driving the intersection, that the gazebo and exhibit on the north side of Chicago Road are structured and located in such a way that there is no obstruction of view from any direction that would pose a similar safety hazard, or any other.

32

"As a general matter, it is clear that a State's interest in protecting the 'safety and convenience' of persons using a public forum is a valid governmental objective." *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650, 101 S.Ct. 2559 (1981). This is clearly true even where, as here, the safety hazard exists only in limited circumstances, as the potential for even one tragic accident at a busy intersection clearly constitutes a compelling interest which the State must address.

Further supporting this and extending this legitimate concern, Defendants correctly argue that if it allowed the installation of Mr. Satawa's private structure in this median, the Commission would have to allow all private installations of all shapes and sizes in medians all over Macomb County thereby creating safety hazards all over the county. Courts may consider the cumulative impact if many others decided to engage in similar conduct. *See Heffron*, 452 U.S. at 652-54, 101 S.Ct. at 2566-67; *see also ACORN v. City of Phoenix, supra*, 798 F.2d 1270.

Finally, although not specifically relied upon in this portion of the Court's analysis, Plaintiff is not left without any comparable viable site for his expression, since, as discussed below, St. Anne's Church, just a few hundred yards from the proposed median site, will permit a prominent display of the crèche (with lighting) on Mound Road and with virtually no public safety implications, as it has in past years when it was not possible for Plaintiff to display the crèche in this median.

Based upon the foregoing, the Court finds that Plaintiff has not shown a strong likelihood of success on the merits of his Free Speech claim.

<u>PLAINTIFF'S ESTABLISHMENT CLAUSE CLAIM</u>

Neither Plaintiff nor Defendants have discussed Plaintiff's likelihood of success on Count II of his Complaint which is Plaintiff's claim of violation of the Establishment Clause. However, the Court finds that it is not likely that Plaintiff will succeed with this claim.

The Establishment Clause of the First Amendment to the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion. . . ." Neutrality is the fundamental requirement of the Establishment Clause, which prohibits the government from either endorsing a particular religion or promoting religion generally. *See Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 703, 114 S.Ct. 2481(1994) ("[A] principle at the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion."); *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Gillette v. United States*, 401 U.S. 437, 450, 91 S.Ct. 828, 836 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes to favor the adherents of any sect or religious organization.")

In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105 (1971), the Supreme Court articulated a three-prong test to determine whether a statute or governmental action

34

violates the Establishment Clause.[12]  In order to pass muster under the *Lemon* test, the

government's action must satisfy all of these three criteria: (1) the government's action

must have a secular purpose; (2) its principal and primary effect must be one that neither

advances nor inhibits religion; and (3) it must not foster excessive government

entanglement with religion.  *Lemon*, 403 U.S. at 612-13, 91 S.Ct. at 2111.  The first and

second prongs have since been reformulated.  After *McCreary County v. ACLU*, 545 U.S.

844, 125 S.Ct. 2722 (2005), the first is now a "predominant purpose" test. *McCreary*

*County*, 125 S.Ct. at 2733; *id*. at 2757 (Scalia, J., dissenting) ("[T]he [*McCreary County*

majority] replaces Lemon's requirement that the government have 'a secular . . . purpose'

with the heightened requirement that the secular purpose 'predominate' over any purpose

to advance religion." (quoting *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105)).

   As indicated above, Defendants have stated that the purpose of their policy and, in

particular, their denial of Plaintiff's application for a permit to erect his Nativity scene

is/was a secular one -- to maintain traffic safety.  But, even Defendants' avoidance of an

an Establishment Clause violation is a "secular purpose."  "Actions taken to avoid

potential Establishment Clause violations have a secular purpose under the *Lemon* test."

---

[12]  Although the Supreme Court has articulated other tests in certain particular
contexts (*e.g.,* the "endorsement" test, *see Allegheny v. ACLU,* 492 U.S. 573 (1989) and
the "coercion" test, *see Lee v. Weisman*, 505 U.S. 577 (1992)), the Sixth Circuit expressly
has determined that, other than in aid-to-education cases, the rule that this Circuit will
adhere to is the traditional *Lemon* analysis.  *See ACLU v. Mercer County*, 432 F.3d 624,
635 (6th Cir. 2005); *Hansen v. Ann Arbor Public Schools*, 293 F. Supp.2d 780, 804 n.28
(E.D. Mich. 2003)

*See Stratechuk v. Bd. of Ed., South Maplewood School Dist.*, 587 F.3d 597 (3rd Cir. 2009); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1255 (9th Cir.), *cert. denied*, 552 U.S. 1062 (2007); *Roberts v. Madigan*, 921 F.2d 1047, 1054 (10th Cir.1990), *cert. denied*, 505 U.S. 1218 (1992).

Turning to the *Lemon* test's effect prong, the "principal or primary effect" of the challenged policy or practice, this prong asks "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval" of religion. *Lynch v. Donnelly, supra*, 465 U.S. at 690 (O'Connor, J. concurring). "While an adjudication of [a policy's] effect must take into account the perspective of one who is neither Christian nor Jewish, as well as of those who adhere to neither of these religions, the constitutionality of its effect must also be judged according to the standard of a 'reasonable observer.'" *County of Allegheny v. ACLU*, 492 U.S. at 620. A reasonable observer here would not find that the Road Commission's policy of not permitting the placement of temporary structures in the medians of major roadways conveys a message of endorsement or disapproval of religion.

The final prong of the *Lemon* test considers whether the challenged policy or practice "foster[s] an excessive government entanglement with religion." No such entanglement can be found in this case.

For the foregoing reasons, for purposes of Plaintiff's request for preliminary injunctive relief, the "likelihood of success" prong does not tip in favor of Plaintiff.

2.      <u>IRREPARABLE HARM</u>

Plaintiff argues that he will be irreparably harmed without the preliminary injunctive relief requested and relies upon the Supreme Court's finding that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Newsome v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989), (citing *Elrod*) ("The Supreme Court has unequivocally admonished that even  minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief.")

However, as indicated above, not only is it unlikely that Plaintiff can show a violation of his First Amendment rights, but also, as Defendants note, it is difficult to see how Plaintiff would be "irreparably harmed" by not being able to put up his display on the median, since has he stipulated, he will not be entirely precluded from putting up his display, and his only limitation is that he cannot put it up on the median.   As noted, Father Bondy has stated that Plaintiff can erect his crèche on the property of St. Anne's Catholic Church just a few hundred feet away on Mound Road and that he can illuminate the crèche all night.  [*See* 12/21/09 Stipulation.]  Although this location is perhaps not as visible by Chicago Road traffic, or south-bound Mound Road traffic, it would be even more prominently visible to North-bound Mound Road traffic, and, therefore, this trade-off dictates that the Court find Plaintiff is not irreparably harmed.

3.    HARM TO OTHERS/IMPACT OF A PRELIMINARY INJUNCTION ON THE PUBLIC

Finally, the public's interest in allowing the Road Commission to regulate its

37

roadways in the safest way it sees fit cannot be denied.  Therefore, to grant Plaintiff the injunctive relief he requests would, in this instance, effectively override the Commission's authority and allow Plaintiff, by placing his Nativity scene on the proposed median site, to create the potential traffic hazard described by the Court, which could prove dangerous to others.  Clearly, this would not be in the public interest.

CONCLUSION

Although this case presents very close issues of fact and law, a number of which are unique and peculiar to the circumstances of this case, the Court finds for the reasons it has set forth herein, that on balance, it must deny Plaintiff's Motion for a Temporary Injunction.[13]

For the foregoing reasons,

IT IS HEREBY ORDERED that Plaintiff's Motion for a Temporary Injunction is DENIED.

IT IS FURTHER ORDERED that within 14 days of the date of this Order, the parties shall SHOW CAUSE, if any there be, why this Order should not be converted to a final Judgment on the merits pursuant to Fed. R. Civ. P. 65(a)(2).

SO ORDERED.

_____

[13]  Although the parties and the Court have dealt with this as a motion for temporary injunction, in view of the Court's factual findings and its own visit to the site, the parties -- and particularly Plaintiff -- should show cause as to whether this decision and Order should not be converted to a final Judgment on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  December 28, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 28, 2009, by electronic and/or ordinary mail.

s/Ruth Brissaud
Case Manager