UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN SATAWA,

                 Plaintiff,                           No. 09-CV-14190-DT

vs.                                            Hon. Gerald E. Rosen

BOARD OF COUNTY ROAD
COMMISSIONERS OF MACOMB
COUNTY, et al.,

                 Defendants.

_____/

OPINION AND ORDER REGARDING CROSS-MOTIONS
FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____ April 19, 2011 _____

PRESENT:  Honorable Gerald E. Rosen
                       Chief Judge, United States District Court

## I.  INTRODUCTION

On October 23, 2009, Plaintiff John Satawa filed a Complaint in this Court seeking declaratory and injunctive relief and nominal damages predicated upon the alleged violation of his First Amendment right to free speech (Count I); violation of the Establishment Clause of the First Amendment (Count II); and violation of the Equal Protection Clause of the Fourteenth Amendment (Count III).  All of Plaintiff's claims arise out of the Macomb County Road Commission's decision to deny Plaintiff a permit to place a crèche and Nativity display during the 2009 Christmas season (from November 28, 2009 to January 9, 2010) on the median in the

1

middle of Mound Road south of Chicago Road in Warren, Michigan.  Plaintiff's Complaint was

followed by a Motion for Temporary Restraining Order and Preliminary Injunction seeking

preliminary injunctive relief based upon Plaintiff's argument that the Road Commission's

decision violated his First Amendment right to engage in private, religious expression in a

traditional public forum.  The Road Commission countered that the Mound Road median is not a

traditional public forum.  The Commission further argued that, even if the median is a traditional

public forum, and its decision to deny the permit does regulate protected speech, its decision

serves a compelling state interest -- the Commission's statutory interest to keep public roads and

rights of way reasonably safe for public vehicular traffic -- and was narrowly drawn to achieve

that end.  The Commission further argued that to make an exception for the Plaintiff's Nativity

scene would violate the Establishment Clause of the First Amendment.

       After hearing oral argument on Plaintiff's motion, the Court, with the parties and their

counsel, conducted a lengthy site visit to view the precise location of Mr. Satawa's proposed

display and to itself drive the relevant roadways and intersections.  The Court thereafter met with

the parties and counsel, outlined its specific questions and concerns, and requested supplemental

filings from the parties.

       On December 28, 2009, the Court entered an Opinion and Order denying Plaintiff's

Motion for Temporary Injunction.  In that Opinion and Order, with regard to the merits of

Plaintiff's First Amendment claim, the Court found it unnecessary to decide whether or not the

Mound Road median was a "public forum" because it determined that the Defendants had

demonstrated a compelling interest for denying Plaintiff the permit to place the Nativity display

on the median -- to-wit, keeping county roads safe for vehicular traffic --  thereby satisfying even

2

the strict scrutiny standards applied to the regulation of speech in traditional public fora.  *See*

*Satawa v. Bd. of County Road Com'rs of Macomb County*, 687 F. Supp. 2d 682, 699-700 (E.D.

Mich. 2009).  In this regard, although the Court found that Defendants' argument that there was

a danger of the structure being struck by a vehicle traveling down Mound Road or in the

intersection to be "purely speculative," it found merit in Defendants' alternative justification  --

that the structure and display could impede sight lines.  Specifically, the Court found that "the

crèche could obstruct the view of motorists driving east-bound on Chicago Road of traffic

traveling north bound on Mound Road causing a potentially significant safety risk where persons

traveling east on Chicago are racing to make it through the traffic light at the intersection and

attempting to determine if there is on-coming traffic from their right on north-bound Mound

Road."  *Id.* at 700.  The Court determined that avoiding this potential danger was a valid

governmental objective, "even where, as here, the safety hazard exists only in limited

circumstances, as the potential for even one tragic accident at a busy intersection clearly

constitutes a compelling interest which the State must address."  *Id.*

     The Court also determined that Plaintiff had failed to show a likelihood of success on his

claim of violation of the Establishment Clause as the County's actions satisfied all three of the

requisite elements of the test set forth by the Supreme Court in *Lemon v. Kurtzman*, 403 U.S. 602

(1971), as reformulated pursuant to *McCreary County v. ACLU*, 545 U.S. 844 (2005).

Specifically, the Court found that Defendants' denial of Plaintiff's permit had a predominantly

"secular purpose"  -- to maintain traffic safety.[1]  The Court also found that a reasonable person

---

[1] The Court further found that Defendants' avoidance of an Establishment Clause
violation constituted a "secular purpose."  "Actions taken to avoid potential Establishment
Clause violations have a secular purpose under the *Lemon* test."  687 F. Supp. 2d at 710 (citing

3

would not find that the Road Commission's policy of not permitting the placement of temporary structures in the medians of major roadways conveys a message of endorsement or disapproval of religion, and therefore, the "effect" prong of the *Lemon* test was satisfied. Finally, the Court determined that the County's policy did not "foster an excessive government entanglement with religion." 687 F. Supp. 2d at 701-02.

In view of the Court's factual findings and its own visit to the site, after entering the December 28 Opinion and Order, the Court ordered the parties to show cause why its Opinion and Order denying Plaintiff's Motion for a Preliminary Injunction should not be converted to a final Judgment on the merits pursuant to Fed. R. Civ. P. 65(a)(2). Defendants agreed that the Order should be so converted, but Plaintiff objected and requested an opportunity to more fully develop a factual record through discovery to give him the opportunity to challenge the veracity of Defendants' assertion that the decision to deny the permit was based upon a determination that the Nativity posed a significant danger to public safety and to ascertain what specifically was discussed at the March 6, 2009 meeting of the Board of Commissioners with respect to Plaintiff's application for the permit. Plaintiff also stated that he wanted to proceed with discovery with regard to his Establishment Clause and Equal Protection claims which had not been addressed in his preliminary injunction filings. The Court granted Plaintiff's request and the case, accordingly, proceeded with discovery.

Discovery has now closed and the parties now cross-move for summary judgment.

Having reviewed and considered the parties' briefs and supporting evidence, and the

---

*Stratechuk v. Bd. of Ed., South Maplewood School Dist.*, 587 F.3d 597 (3rd Cir. 2009); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1255 (9th Cir.), *cert. denied*, 552 U.S. 1062 (2007); *Roberts v. Madigan*, 921 F.2d 1047, 1054 (10th Cir.1990), *cert. denied*, 505 U.S. 1218 (1992).)

4

entire record of this matter, the Court finds that the pertinent facts and legal contentions are sufficiently presented in these materials, and that oral argument would not assist in the resolution of this matter.  Accordingly, pursuant to Eastern District of Michigan Local Rule 7.1(f)(2), the Court will decide Defendant's motion "on the briefs." This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

### THE PARTIES

Plaintiff John Satawa is a resident of the City of Warren, Michigan.  The Defendant Board of County Road Commissioners of Macomb County (the "Board" or the "Road Commission") is a corporate body formed in accordance with Michigan statutory law.  *See* M.C.L. § 224.9.  The Board consists of three commissioners and is charged with the responsibility for overseeing the Road Commission's budget and establishing and carrying out policies with regard to all matters pertaining to the County roads.  Defendant Fran Gillett has been a Road Commissioner since 2000, and in 2009 was the Chairperson of the Board. Defendant Robert Hoepfner is the County Highway Engineer for Macomb County.  Mr. Hoepfner is responsible for the supervision, maintenance, design, construction, permitting, right-of-way, and traffic engineering operations of the Road Commission.  He has served in this capacity since 1995.

### REMOVAL OF MR. SATAWA'S NATIVITY DISPLAY IN 2008

On December 10, 2008, the Board received via fax a letter from the Freedom from Religious Foundation, written on behalf of an unidentified  "concerned Macomb County resident," who objected to a Nativity scene erected on the median of Mound Road, south of

Chicago Road, in Warren, Michigan.[2]  Mound Road is a County road, and as such, is

_____

[2]  The letter, dated December 10, 2008, stated as follows:

Dear Commissioners:

I am writing on behalf of a concerned Macomb county resident, who objects to the erection and maintenance of a nativity scene on County property.  Freedom From Religion Foundation (FFRF) is a national nonprofit organization based in Madison, Wisconsin with over 13,000 members across the country.  Our purpose is to protect the fundamental constitutional principle of separation of church and state.

It is our information and understanding that a nativity scene has been erected in the median at the intersection of Mound Road and Chicago Road in the city of Warren.  Our complainant informs us there is a sign inside the glass-enclosed crèche that reads "In Memory of Joseph and Rose Satawa."  Additionally, there is a wooden sign that states "A blessed Christmas, St. Anne Parish."

It is unlawful for the Road Commission of Macomb County to maintain, erect, or host a holiday display that consists solely of a nativity scene, thus singling out, showing preference for, and endorsing one religion.  The Supreme Court has ruled it is impermissible to place a nativity scene as the sole focus of a display on government property.  *See Allegheny v. ACLU of Pittsburgh*, 492 U.S. 1989; *Lynch v. Donnelly,* 465 U.S. 668 (1983).

In *County of Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573 (1989), the Supreme Court held that a county government's crèche displayed in the county courthouse was an unconstitutional endorsement of religion.  The Court stated,

>    "Lynch v. Donnelly, confirms, and in no way repudiates, the longstanding constitutional principle that government may not engage in a practice that has the effect of promoting or endorsing religious beliefs.  The display of the crèche in the county courthouse has this unconstitutional effect.  *Id.* at 621.

The Court further determined that the placement of the crèche on the Grand Staircase of the county courthouse contributed to its illegality because "no viewer could reasonably think it occupies this location without support and approval of the government."  *Id.* at 599600.  Moreover, the Court found that the nativity scene "sen[t] an unmistakable message that 'the county] supports and promotes the Christian praise to God that is the crèche's religious message."  *Id.* at 601.

It is irrefutable that the crèche is a religious, Christian symbol.  *See Lynch v. Donnelly*, 465 U.S. 668, 711 (1984) (Brennan, J. Dissenting) (stating that the crèche is a "recreation of an event that lies at the heart of the Christian faith").  Displaying an inherently Christian message at a busy

under the jurisdiction of the Macomb County Road Commission.  [*See* 30(b)(6) Deposition of

_____

intersection on County-owned property unmistakably sends the message that Macomb County endorsed the religious beliefs embodied in the display.  When the County displays this manger scene, which depicts the legendary birth of Jesus Christ, it places the imprimatur of the Macomb County government behind the Christian religious doctrine.  This excludes citizens who are not Christians -- Jews, Native American religion practitioners, animists, etc., as well as the significant and growing portion of the U.S. population that is not religious at all [14% of adults], including complainants and taxpayers in your county.

The constitutional concerns are not alleviated simply because the crèche is erected and/or owned by St. Anne Parish.  The Supreme Court stated in Allegheny,

> "[t]he fact that the crèche bears a sign disclosing its ownership by a Roman Catholic organization does not alter this conclusion.  On the contrary, the sign simply demonstrates that the government is endorsing the religious message of that organization, rather than communicating a message of its own.  But the Establishment Clause does not limit only the religious content of the government's own communications.  It also prohibits the government's support and promotion of religious communications by religious organizations."  *Id.*

There is further government entanglement because the illumination of the display is presumably provided by the city.

There are ample private and church grounds where religious displays may be freely placed, including, presumably, St. Anne's Parish, where this display clearly belongs.  Once the government enters into the religion business, conferring endorsement and preference for one religion over others, it strikes a blow at religious liberty, forcing taxpayers of all faiths and of no religion to support a particular expression of worship.  We ask that you immediately phone St. Anne's Parish to have them remove the display to private property.  May we hear from you immediately about the steps you are taking to remedy this violation?

Sincerely,

/s/
Rebecca S. Kratz
Staff Attorney

[Plaintiff's Summary Judgment Ex. 10.]

Robert Hoepfner, p. 13][3]  Prior to receiving the December 10, 2008 letter, the Road Commission was unaware of the Nativity display.  *Id.* p. 22; *see also* Deposition of Fran Gillett, p. 22.

As a result of the citizen complaint, Robert Hoepfner dispatched Joe Dana, a Road Commission permit inspector responsible for that area of Macomb County, to investigate. [Hoepfner Dep. pp. 19-20.] When Dana returned, he confirmed to Mr. Hoepfner the presence of the Nativity display on the median and reported that crèche had a plaque on the back that had Mr. Satawa's phone number on it. *Id.* p. 19.

a.  The Site of the Display

As indicated, the median in question is the center median of Mound Road just south of Chicago Road.  [*See* 12/17/09 Stipulation of Facts, ¶ 2 and Ex. C.]  Mound Road is a certified Macomb County Road that is currently four lanes north bound, and four lanes south bound.  *Id.* ¶ 6.  The road supports over 82,600 cars a day and has a posted speed limit of 50 mph.  *Id.*  The road is divided by a center median which is segmented by turning lanes and intersections.  The particular median at issue in this case is 60 feet wide.  *Id.* ¶ 3.  Chicago Road is a two-lane road which runs east and west and intersects Mound Road just north of the proposed crèche site.  The Mound Road - Chicago Road intersection is controlled by traffic signals in all directions on both sides of the intersection.

The specific site for Mr. Satawa's display on the median is approximately 25 feet from the curb, facing Chicago Road to the north.  *See id.,* Ex. C.  In front of the site is a sidewalk which adjoins the crosswalks on the north and south bound lanes of Mound Road.  *Id.* Pedestrian

---

[3]  Chicago Road, on the other hand, is not a County road, but rather is a city road under the jurisdiction of the City of Warren.  [Hoepfner Dep. p. 22.]

stop lights facing east and west are located on an electrical pole on the northeast corner of the median. *See* Plaintiff's TRO Exhs. P-1 through P-4. There is a stand of pine trees on the median immediately behind the proposed site. *See* Satawa Dep., p. 80; Plaintiff's Summary Judgment Ex. Ex. 7. These trees are centered between the north and south-bound roadways and are collectively 29 feet, 4 inches wide. 12/17/09 Stipulation, ¶ 2. The trees are less dense in foliage on the lower branches than on the upper branches, permitting visibility, albeit somewhat diffused, of the north-bound Mound Road traffic if one is traveling east-bound on Chicago Road through the signal-controlled intersection. *See e.g.,* Plaintiff's SJ Ex. 7; Plaintiff's TRO Ex. P-1.

On this same median island behind the stand of trees are various unattended pieces of old farming equipment and wagons. *See* Plaintiff's SJ Ex. 19. These items are displayed by the "Friends of the Village," a private organization of local residents seeking to maintain the "village" character of Warren. *See id.* There are also two benches for public seating -- one a wooden park bench and one a smaller concrete bench -- on this portion of the median.

On the median just north of Chicago Road, there is a small gazebo and courtyard erected by the Village of Warren Historical Commission. *See id.* This permanent display was installed in 1982 when the State of Michigan Historical Society erected a Historical Site Marker honoring the former Village of Warren. *See* Hoepfner Affidavit, Defendants' Ex. A ¶ 33 and Plaintiff's Ex. Ex. 19.] The Road Commission permitted the permanent installation but on condition that the City of Warren indemnify and hold the Commission harmless through a Warren City Resolution accepting the liability and providing indemnification. [Hoepfner Aff. ¶ 34.] The City of Warren currently insures this historic site with a $5 million insurance policy. *Id.* ¶ 37; Plaintiff's Ex. 20.

9

b. <u>Structure of the Display</u>

Mr. Satawa's Nativity display (as erected in 2008) consists of a log cabin-like structure standing 9 ½ feet high and 8' x 8' in width and depth.  (Although the physical structure of the crèche is 8' x 8' x 8', the actual height of the display is 9 ½ feet as it sits on top of an 18-inch high raised platform.)  The crèche has windows on both the front and back of the structure so that the statues displayed within could be seen from both Mound and Chicago Roads.  The display is illuminated at night.  The crèche itself has a sign on it saying "A Blessed Christmas, St. Anne Parish."  Inside the glass-enclosed crèche is another sign reading "In Memory of Joseph and Rose Satawa."

After hearing Permit Inspector Dana's report, Mr. Hoepfner called Mr. Satawa and told him that, because he did not have a permit for the display, he would have to take it down. [Hoepfner Dep. p. 19, 24.]  Hoepfner followed up on this telephone conversation with a letter the next day, December 11, 2008, directing him to remove the display within 30 days.  *Id.* p. 25.[4]

---

[4]  Hoepfner's letter stated as follows:

Dear Mr. Satawa:

It has come to the attention of the Road Commission of Macomb County that you have installed a temporary structure in the median of Mound Road south of Chicago Road in the City of Warren.  A search of our records indicates that no permit was issued for this structure to be placed in the Road Commission right of way.

This letter serves as your notice to immediately remove the structure from the right of way.  If removal does not occur within 30 days of the receipt of this letter, the Road Commission forces will remove the structure and bill you for the costs incurred.

If you have any questions regarding this matter, please feel free to contact me.

10

According to Plaintiff, he and his family had set up a Nativity scene on the Mound Road median during the Christmas holiday every year but one (due to major construction on Mound Road) since 1945.[5]  Nonetheless, he complied with Hoepfner's directive and removed the display.

PLAINTIFF'S 2009 PERMIT APPLICATION

In January 2009, Mr. Satawa went to the office of the Road Commission to obtain a permit for the display of his Nativity scene the following Christmas holiday season. [Satawa Declaration, ¶ 22]  Assisted by permit department staff, Plaintiff completed a permit application on the spot and was informed that he would receive a response from the Road Commission in two to three weeks. *Id.* ¶ 24.  On February 7, 2009, however, Plaintiff received a letter from permit department informing him that his application was incomplete.  Included with the letter was a new application for Plaintiff to complete and sign. *Id.* ¶ 25.  With the assistance of counsel, Mr. Satawa completed this new application setting forth therein the details of his proposed Nativity display and included with the application photographs showing the size and precise location of the display from various angles, purportedly to show that the display would not obstruct any vehicular or pedestrian traffic or create any public safety issues.  *Id.* ¶¶ 32-33.

———————————

        Sincerely,

        /s/
        Robert P. Hoepfner, P.E.
        County Highway Engineer

[Plaintiff's  SJ Ex. 11.]

---

    [5]  The history of the display and the various changes made in the form of the display over the years are set forth in the Court's December 28, 2009 Opinion and Order Denying Plaintiff's Motion for Preliminary Injunction, *Satawa v. Bd of County Road Com'rs of Macomb County*, 687 F. Supp. 2d 682 (E.D. Mich. 2009).

In this new permit application Plaintiff stated as follows:

> Applicant, Mr. John Satawa, requests permission to temporarily display a Nativity Scene in the median of Mound Road south of Chicago Road in the City of Warren for a period beginning on November 28, 2009 and ending on January 9, 2010. Applicant's display is intended to be an exercise of his private religious speech, which is fully protected under the Free Speech Clause of the First Amendment.
>
> The proposed Nativity Scene is approximately 8' x 8' x 8' at the peak, and it will be displayed in a manner similar to how it has been displayed at this location for the past 60 years. The enclosed photographs which were taken of the display in January 2009, illustrate the nature, size, and location of the proposed display. As demonstrated by the photographs, there are no obstructions to vehicular or pedestrian traffic or any other safety concerns caused by the display.
>
> The proposed display will be lighted by two 150W floodlights and two 100W light bulbs. There is an electrical outlet available at the median location that has been used in previous years to provide power for the display. Applicant will pay for all electrical costs associated with his display. Additionally, applicant will be responsible for putting up and taking down the display. No assistance from government employees will be required.
>
> Please advise if any insurance will be required, the reasons for said insurance, and the amount. Applicant is willing to pay all *reasonable* costs associated with his temporary display. Applicant is also willing to post a sign at the display which clearly states that it is his private display and not the display of Macomb County, the City of Warren, or any other government entity. Applicant is willing to coordinate and cooperate with Macomb County on the content, size and location of the sign.

[Plaintiff's SJ Ex. 15 (emphasis in original).]

Mr. Hoepfner testified that he had numerous discussions with the commissioners during the course of day-to-day business about the display, and taking into account all the discussions, "many, many hours" were spent reviewing Plaintiff's application. [Hoepfner Dep. p. 106-07.] During these discussions, Hoepfner expressed his concerns about the safety of the display being erected on the Mound Road median and recommended that Mr. Satawa's permit not be approved based on those concerns. *Id.* He testified that the Board members concurred with his

12

recommendation.  *Id.* at 107.  Fran Gillett also testified that there were discussions in the hall and in her office with Hoepfner about the safety concerns raised by Mr. Satawa's proposed display. [Gillett Dep. p. 78-9.] Hoepfner viewed Satawa's proposed display as presenting a danger to public safety because "[i]t's an encroachment and an obstruction within our right-of-way that could be struck by a vehicle." [Hoepfner Dep. at 31-32.]  He further testified that, although he did not base denial of the permit on other safety grounds, in his opinion, the display would also violate standards set forth in the Michigan Road Design Manual which are set forth in the Road Commission's Subdivision Development Procedures, Standards and Specifications.  *Id*. at 33. Specifically, Hoepfner pointed to the "clear zone" standard and the requirements regarding sight distance.  *Id.*

Though he had had numerous discussions with the individual Board members about the unsafe nature of the display Mr. Satawa proposed to erect, on March 6, 2009, Mr. Hoepfner decided to address Mr. Satawa's permit application before the full three-member Board at their regular public meeting.  Hoepfner testified that permit applications are not normally brought formally before the Board at a public meeting but rather are simply handled administratively by him and his permit office staff.  *Id.* at pp. 17-19, 42.  Hoepfner thought, however, that in this instance, the full Board should be fully informed of his intended denial of the permit, to give the Board a "heads up as to what I was going to do" because he was sure "they were liable to hear about it."  *Id.* at p. 42, 44.

Hoepfner testified that Satawa's permit application was discussed at the March 6, 2009 meeting during the informal, informational "new business" portion of the meeting, after all regular business was completed.  *Id.* at 39-40.  The meeting was tape-recorded.  According to the

13

transcript of the meeting, Hoepfner told the Board:

> MALE SPEAKER [Hoepfner][6]:  This is an interesting one, last year a gentleman for the last 60 years has been installing a nativity scene at Mound Road and Chicago Road in the median of Mound Road.  I received a letter from some anti-nativity scene law firm asking me to get rid of it. . . .
>
> . . . So I wrote the man a letter and ordered him to remove the nativity scene from the right-of-way.  He has come in now and applied for a permit to install the nativity scene next year.  His cover letter is from a law firm, the Thomas More [sic] Law Center.  I've contacted [Attorney] Ben Aloia and asked him to research it.  Ben has informed me that we should not allow this nativity scene to be installed, and he has given me some language that I should respond to the permit.  I intend to do that.  This probably won't go away and I suspect they'll sue us.
>
> FEMALE SPEAKER [Gillett]:  All we can do is obey the law.

[Plaintiff's SJ Ex. 24.][7]

---

[6]  The speakers identified on the transcript as "Male Speaker" and "Female Speaker" were identified by Fran Gillett in her Deposition, the male speaker being Robert Hoepfner and the female speaker being Ms. Gillett.  [*See* Gillett Dep. pp. 54-55.]

[7]  The Court notes that admissibility of this transcript might be problematic as the recording from which the transcript was made has not been authenticated.  The transcript provided by Plaintiff was transcribed by a private court reporter apparently hired by Plaintiff's counsel.  There is no certification, however, as to the authenticity of the MP3 recording from which the transcription was prepared.  Plaintiff has submitted as one of his exhibits an email with an MP3 file attachment noted from Defendant's counsel to Plaintiff's counsel stating "I attached an audio recording of the meeting where the nativity scene was discussed," but Defendant's counsel does not state that he was at the meeting or that he made the original recording of it.  Ms. Gillett testified in her deposition that she listened to an audio recording of the March 6, 2009 meeting, however, she was not asked to listen to the recording at her deposition or review the transcript of it, or otherwise authenticate it.  Mr. Hoepfner testified in his deposition that he had not listened to the audio recording of the meeting at all.  Nonetheless, since neither party has objected to the Court's consideration of this transcript in deciding the summary judgment motions, the Court will assume that the authentication deficiency will be able to be cured if this matter were to go trial.  The Court is permitted to consider evidence submitted at summary judgment in non-admissible form when the evidence "will be reduced to admissible form at trial." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir.1996) (allowing otherwise admissible evidence to be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form). *See also Glekten v. Democratic Cong.*

14

On March 9, 2009, Mr. Hoepfner sent Plaintiff's attorney a letter formally denying

Plaintiff's application for a permit for his display.  The denial letter stated as follows:

> Dear Mr. Muise:
>
> Please allow this letter to serve as the Board of County Road Commissioners for the County of Macomb's formal denial of the January 7, 2009 Application for Permit submitted by John Satawa to erect a nativity scene in the Mound Road right of way.  Given the religious nature of your nativity scene, the Road Commission of Macomb County as a governmental agency must weigh whether or not the approval of such a permit would be deemed a violation of the First Amendment of the United States Constitution.
>
> A statute or practice that touches on religion, if it [is] to be permissible under the establishment of religion clause of the Constitution's First Amendment, (1) must have a secular purpose, (2) must neither advance nor inhibit religion in its principal or primary effect, and (3) must not foster an excessive entanglement of government with religion.  In *Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573 (1989), the U.S. Supreme Court held that "there is no doubt, of course, that the crèche (nativity scene) itself is capable of communicating a religious message."
>
> Since the nativity scene Mr. Satawa desires to place in the right of way clearly displays a religious message, this would be a violation of the Establishment Clause of the First Amendment.  "*Establishment Clause*, at the very least, prohibits government from appearing to take a position on questions of religious belief or from 'making any adherence to a religion relevant in any way to a person's standing in the political community.'"  *Allegheny*, at 594.
>
> The Road Commission of Macomb County cannot permit you to display this nativity scene in the Road Commission's right of way.  This undoubtedly would be interpreted as our endorsement of religion, in violation of the *Establishment Clause of the U.S. Constitution*.
>
> Thank you for your attention to this matter.  Please do not hesitate to contact me with an questions or concerns.

---

*Campaign Comm., Inc*., 199 F.3d 1365 (D.C. Cir. 2000) (holding that any evidence considered by a court at the summary judgment stage "must be capable of being converted into admissible evidence." *Id*. at 1369.); *DeBiasi v. Charter County of Wayne*, 537 F. Supp. 2d 903, 911 (E.D. Mich. 2008) (Though "Plaintiff's log is clearly hearsay. . . [i]f the contents of DeBiasi's log could be presented in an admissible form at trial, the Court may consider the log's contents in deciding Defendants' summary judgment motion." *Id.*)

Sincerely,
/s/
Robert P. Hoepfner, P.E.
County Highway Engineer

[Plaintiff's SJ Ex. 9.]

Defendant Hoepfner admitted in his deposition that this letter only addressed some of the reasons for his denial of Plaintiff's permit application; it did not address the safety concerns. [Hoepfner Dep. p. 44.] Hoepfner stated that since Mr. Satawa had stated in his permit application that he sought to erect his display as an exercise of his private religious speech, the denial letter addressed this aspect of the application. [Hoepfner Affidavit, Defendant's Ex. A, ¶ 31]. He further stated that since the Commission had already determined when it sent Mr. Satawa the letter dated December 11, 2008 that the structure was a significant danger to public safety and reached the same conclusion when it considered his application in 2009, he viewed Satawa's "freedom of religious expression" application as seeking an exception to the Road Commission's general policy of not allowing private installations in the medians of major highways and primary roads, and so, addressed only that issue in his denial letter. *Id.* ¶¶ 30-31.

That Satawa's proposed Nativity scene could potentially pose a safety hazard was confirmed by Defendants' expert, Dr. William C. Taylor, Ph.D. Although Dr. Taylor found that the Nativity display did not pose a "strike hazard," he did find the crèche to present a visibility obstruction that would impede the view a driver proceeding eastbound on Chicago Road at a rate of speed of 18 to 24 miles per hour of oncoming northbound Mound Road traffic.[8] *See* Taylor Dep. pp. 23-36; 47-51 and Defendants' Response Exhs. J, K. According to Dr. Taylor, the sight

---

[8] The speed limit on Chicago Road is 30 mph and on Mound Road it is 50 mph.

16

line impediment lasts for a period of at least one second so if the eastbound driver does not look

over again while approaching or driving through the intersection, and thus, not alerted to an

oncoming, northbound Mound Road driver traveling at a rate of 30-60 miles per hour who

travels through a red light (whether intentionally or because he is distracted, drowsy or impaired

by alcohol or some other substance), the crèche creates a potentially significant safety hazard.

*See id.*

> Plaintiff's expert, Dr. John F. Weichel, Ph.D., concurred with Dr. Taylor that
>
> [i]f traffic is approaching eastbound on Chicago Road, there is the possibility that a driver traveling in that direction who is not obeying traffic signals may not be able to identify the presence of northbound traffic on Mound Road in time to respond to that traffic.  In that case, any visibility obstructions may impede this driver's ability to perceive traffic on Mound Road. . . . The crèche can also be a visibility obstruction in this situation.

[Weichel Report, Defendants' Ex. M, p. 6.]

Dr. Weichel, however, opined that the presence of the crèche does not obscure the

visibility of the eastbound traffic for a sufficient period of time to alter that driver's response.  *Id.*

This opinion was based on the assumption that the Chicago Road vehicle is traveling at a

constant 30 miles per hour and the Mound Road vehicle traveling at 50 miles per hour. *See id.*

In his opinion, at this speed, the crèche would obscure the view of the eastbound Chicago Road

driver for only 0.29 seconds and thereby allow him sufficient time to avoid a collision with the

Mound Road vehicle.  *Id.*

Mr. Satawa testified in his deposition that since this dispute has arisen,  St. Anne's

Parish, which is located just a few hundred yards from the Mound Road median at issue has

offered to permit him to display is Nativity scene on their grounds affronting Mound Road.

[Satawa Dep. p. 55.]  In addition, 9 or 10 other business and property owners along this same

section of Mound Road made the same offer, including Lyle Elliot Funeral Home, Gazebo Banquet Center, St. Paul's Lutheran Church, the K of C Council and several individuals. *Id.* Nonetheless, Mr. Satawa has stated that his goal is to once again display his Nativity scene in the median of Mound Road and he intends to continue to make requests for a permit to allow him to do so. *See* Satawa Supplemental Declaration, ¶ 4.

III.  ANALYSIS

A.    APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are

18

"genuinely disputed." Fed. R. Civ. P. 56(c)(1). Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

The Court will apply the foregoing standards in deciding the parties' cross-motions for summary judgment in this case.

B.    THE "LAW OF THE CASE DOCTRINE" IS INAPPLICABLE  HERE

As an initial matter, the Court addresses Defendants' argument that the Court's prior ruling denying Plaintiff's Motion for a Preliminary Injunction is "law of the case" which dictates that Defendants now be granted summary judgment on Plaintiff's Free Speech and Establishment Clause claims.

The "law of the case" doctrine "'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 815-16, 108 S.Ct. 2166, 2177 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391 (1983)). This rule of practice promotes the finality and efficiency of the judicial process by "protecting against the agitation of settled issues." *Id.* However, unlike the more precise requirements of res judicata and collateral estoppel, "law of the case is an amorphous concept." *Arizona v. California*, 460 U.S. at 618, 103 S.Ct. at 1391. "Rulings that simply deny extraordinary relief for want of a clear and strong showing on the merits, or that are avowedly preliminary or tentative, do not trigger

19

law of the case consequences." *Wilcox D.O., P.C. Employees' Defined Benefit Trust v. United States*, 888 F.2d 1111, 1113 (6th Cir. 1989).  Thus, a court's determination of substantive issues in deciding a motion for preliminary injunction do not constitute "law of the case" for purposes of a decision on the merits of the case.  *Wilcox*, 888 F.2d at 1113.

> As the *Wilcox* court explained,
>
> "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing. . . , and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits. . . ."

888 F.2d at 1113, 1114 (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981) (some internal punctuation omitted); *accord In re DeLorean Motor Co.*, 755 F.2d 1223, 1230 (6th Cir.1985).  *See also Bd. of Trade v. Commodity Futures Trading Comm'n*, 605 F.2d 1016, 1020 (7th Cir.1979), *cert. denied*, 446 U.S. 928 (1980) (refusal to stay a preliminary injunction pending appeal did not establish the law of the case since it rested on nothing more than a tentative appraisal of the probable result on the merits); *City of Angoon v. Hodel*, 803 F.2d 1016, 1024 n. 4 (9th Cir.1986), *cert. denied*, 484 U.S. 870 (1987) (determinations made in interlocutory appeal from a preliminary injunction do not constitute the law of the case); *Berrigan v. Sigler*, 499 F.2d 514, 518 (D.C. Cir. 1974) ("The decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute the law of the case for the purposes of further proceedings and does not limit or preclude the parties from litigating the merits, unless there has been an order of consolidation pursuant to Rule 65(a)(2)").

20

Because of the lesser burden of proof required to support a motion for preliminary injunction as contrasted with a motion for summary judgment, courts consistently have concluded that decisions on preliminary injunctions do not constitute law of the case and, therefore are not binding on a motion for summary judgment. *See Golden State Transit Corp. v. City of Los Angeles*, 754 F.2d 830, 832 n. 3 (9th Cir.1985) (quoting *City of Anaheim v. Duncan*, 658 F.2d 1326, 1328 n. 2 (9th Cir.1981)), *rev'd on other grounds*, 475 U.S. 608, 106 S.Ct. 1395 (1986)); *Wilcox, supra*, 888 F.2d at 1113-14 (because ruling on preliminary injunction is not law of the case it is not binding on motion for summary judgment); *Guillermety v. Secretary of Education,* 241 F. Supp. 2d 727, 731-32 (E.D. Mich. 2002) (same); *Harris v. Fitchville Twp. Trustees*, 154 F. Supp. 2d 1182, 1186-87 (N.D. Ohio 2001) (same); *Technical Publishing Co. v. Lebhar-Friedman, Inc*., 729 F.2d 1136, 1139 (7th Cir.1984) ("A factual finding made in connection with a preliminary injunction is not binding" on a motion for summary judgment); *Marathon Petrol. Co. v. Lo Bosco*, 623 F. Supp. 129, 131 (N.D. Ill.1985) (same).

The foregoing authorities make clear that Defendants' contention that the findings of fact and conclusions of law made by the Court in denying Plaintiff's Motion for a Preliminary Injunction are "fatal" to Plaintiff's Free Speech and Establishment Clause claims lacks legal merit.   The Court, therefore, will proceed to consider *de novo* the pertinent facts -- as more fully developed through discovery -- and the applicable law in deciding the instant summary judgment motions.

C.     PLAINTIFF'S FREEDOM OF SPEECH CLAIM

In Count I of his Complaint Plaintiff contends that the Road Commission's denial of his application to display his Nativity scene in the Mound Road median violated his First

21

Amendment right to freedom of speech.

To determine the constitutionality of a governmental restriction on speech on publicly-owned property requires consideration of three questions:  (1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; and (3) whether the restriction on speech in question satisfies the constitutional standard for the forum.  *Miller v. Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010) (citing *S.H.A.R.K. v. Metro Parks Serving Summit County*, 499 F.3d 553, 559 (6th Cir. 2007)).

The parties here do not dispute the display of a Nativity scene is an act of constitutionally protected religious expression.  *See Allegheny v. ACLU of Pittsburgh*, 492 U.S. 573, 598, 109 S.Ct. 3086, 3103 (1989).  The question here is whether Plaintiff has a constitutionally protected right to display the Nativity scene on the median in Mound Road, a County Road under the jurisdiction of the Macomb County Road Commission.

1.      The Mound Road Median is not a Traditional Public Forum

Simply because the government may own a piece of property does not mean that property is open at all times to all types of expressive activity.  *Miller v. City of Cincinnati*, *supra*, 622 F.3d at 533.  "[T]he State, no less than a private owner of property, has power to preserve the property under its control for the use for which it is lawfully dedicated."  *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S.Ct. 948, 955 (1983)).  "Even protected speech is not equally permissible in all places and at all times.  Nothing in the Constitution requires that Government freely grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."  *Boardley v. United States*

22

*Dep't of Interior*, 615 F.3d 508, 514 (D.C. Cir. 2010) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800, 105 S.Ct. 3439, 3447 (1985)).  *See also Capitol Square Review and Advisory Bd. v. Pinette*, *supra*, 515 U.S.753,761, 115 S.Ct. 2440, 2446 (1995) ("It is undeniable, of course, that speech which is constitutionally protected against state suppression is not thereby accorded a guaranteed forum on all property owned by the State.")

For First Amendment purposes, Government property has been divided into three categories:  traditional public fora, designated (or "limited") public fora, and non-public fora.  *See Cornelius v. NAACP Legal Def. & Educ. Fund, supra*, 473 U.S. at 800, 105 S.Ct. at 3449.  Public fora generally are those "places which by long tradition or by government fiat have been devoted to assembly and debate." *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954.  A second category of public fora consists of "public property which the State has opened for use by the public as a place for expressive activity." *Id.*, 460 U.S. at 45, 103 S.Ct. at 955. *See, e.g., Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269 (1981) (university meeting facilities); *City of Madison Joint School Dist. No. 8 v. Wisconsin Empl. Relations Comm'n*, 429 U.S. 167, 97 S.Ct. 421 (1976) (school board meeting); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239 (1975) (municipal theatre).  This type of public forum has been called a "limited public forum," or "designated public forum." *San Diego Committee Against Registration and the Draft (CARD) v. Governing Bd. of Grossmont Union High School Dist.*, 790 F.2d 1471, 1475 (9th Cir.1986). "A limited public forum may, depending upon its nature and the nature of the state's actions, be open to the general public for the discussion of all topics, or there may be limitations on the groups allowed to use the forums or the topics that can be discussed." *Id.*  At the opposite end of the spectrum is a non-public forum.

23

A non-public forum, by contrast, is a government-owned property that is not by tradition or governmental designation "a forum for public communication."  *Perry Educ. Ass'n, supra*, 460 U.S. at 46, 103 S.Ct. at 955;  *Miller v. City of Cincinnati, supra*, 622 F.3d at 524; *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir.2007).  Plaintiffs here argue that the Mound Road median in question is a public forum.[9]

Streets and parks are traditional public fora.  The Supreme Court "long ago recognized that members of the public retain strong free speech rights when they venture into public streets and parks, which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, ___, 129 S.Ct. 1125, 1131 (2009) (quoting *Perry Ed. Ass'n. v. Perry Local Educators' Ass'n*., 460 U.S. at 45, 103 S.Ct. at 954-55 (quoting *Hague v. Committee for Industrial Organization*, 307 U.S. 496, 515, 59 S.Ct. 954, 964 (1939))).  Plaintiff argues that the median in the center of Mound Road is a public forum because it is in the middle of a public street:  "The property at issue here is a *public* median, which, as a matter of Michigan law, is part of the public street."  [Plaintiff's Brief in Support of his Motion for Summary Judgment, Dkt. #37, p. 13 (citing M.C.L. § 257.20) (emphasis in original).]

As indicated in making this argument, Plaintiff relies upon M.C.L. § 257.20.  Chapter 257 of the Michigan Compiled Laws contains the Motor Vehicle Code.  Section 20 of the Code, M.C.L. § 257.20,  provides a definition of "highway or street":

---

[9] In one brief, footnote without any substantive analysis, Plaintiff also suggests that the Court could also conclude that Defendants created a "designated public forum."

"Highway or street" means the entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel.

M.C.L. § 257.20.

Plaintiff's reasoning is that, because this statute states that "highway or street" encompasses "the entire width between the boundary lines" of every publicly maintained way, the median in the center of Mound Road is necessarily a part of the street, and, therefore, a public forum. However, "[t]he protections of the First Amendment do not rise or fall depending on the characterization ascribed to a forum by the government." *Boardley v. Dep't of Interior, supra*, 615 F.3d at 514. As the *Boardley* court explained:

> Mount Rushmore does not become a public forum merely by being called a "national park" any more than it would be transformed into a non-public forum if it were labeled a "museum." The dispositive question is not what the forum is *called*, but what *purpose* it serves, either by tradition or specific designation. What makes a park a traditional public forum is not its grass and trees, but the fact that it has "immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." [Citations omitted.] Thus, to establish that a national park (in whole or in part) is a traditional public forum, Boardley must show that, like a typical municipal park, it has been held open by the government for the purpose of public discourse.

615 F.3d at 514-15 (emphasis in original). *See also United States v. Kokinda*, 497 U.S. 720, 727, 110 S.Ct. 3115, 3120 (1990) (cautioning "the mere physical characteristics of the property cannot dictate forum analysis" and holding that sidewalk abutting a Post Office was not a public forum). *Cf., Zalaski v. City of Bridgeport Police Dept.*, 613 F.3d 336, 342-43 (2d. Cir. 2010) (remanding case involving First Amendment challenge to arrests of individuals participating in an animal rights protest on plaza outside of a public arena for the district court's consideration of factors relevant to the determination of whether the plaza constituted a traditional public forum,

25

to-wit, the forum's physical characteristics and the context of the property's use, including its location and purpose; the government's intent in constructing the space and its need for controlling expressive activities on the property, as evidenced by its policies or regulations; and whether the property in question is part of a class of property which by history or tradition has been open and used for expressive activity.  *Id*. at 342 (citations omitted).)

Therefore, that the Michigan statute calls "the entire width between the boundary lines" of a right-of-way a "street" does not control the constitutional forum analysis.

Furthermore, even treating the median as  "part of" a public street, because Plaintiff seeks access only to that "part" of the street for the display of his Nativity scene, it is only that part of the venue that is determinative of the forum.  "When speakers seek general access to public property, the forum encompasses that property.  When speakers seek more limited access, however, we must take a more tailored approach to ascertaining the perimeters of [the relevant] forum within the confines of the government property at issue."  *Cornelius v. NAACP Legal Defense and Educ. Fund, Inc*., *supra*, 473 U.S. at 801, 105 S.Ct. at 3448.  *See also Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007) (holding that because plaintiff's speech occurred in the reception area of  the Judge Executive's office it was only the nature of that limited area, and not the general "public" nature of  Fiscal Court Building within which the office was located that was determinative of the forum).

Indeed, even public streets as a whole may not always constitute traditional public fora.  In *ACORN v. City of Phoenix*, 798 F.2d 1260 (9th Cir. 1986), the plaintiffs challenged a Phoenix city ordinance which prohibited soliciting contributions from occupants of vehicles stopped at intersections.  ACORN argued broadly that the city streets constituted a traditional public forum,

26

particularly suited for public expression, which could not be closed to First Amendment

activities.  The defendants disputed plaintiffs' premise.  While the court acknowledged that

public streets were "the prototypical example of a public forum" when a party would seek access

to the streets for a parade or other demonstration, it refused to concede that a street might have

such a public forum character at all times:

> To conclude that the streets may generally be categorized as traditional public
> fora may not require us to also conclude that the streets at all times and under all
> circumstances are susceptible to characterization as a perpetual public forum
> uniquely available for free expression.  The district court ruled, "Clearly, by long
> tradition or government fiat' such areas [streets] are not designated as forums for
> public communication *while in use by vehicular traffic*."  605 F. Supp. at 871.
>
> As a practical matter, there are indeed substantial differences in nature
> between a street, kept open to motorized vehicle traffic and a sidewalk or public
> park.  A pedestrian ordinarily has an entitlement to be present upon the sidewalk
> or on the grounds of a park and thus is generally free at all times to engage in
> expression and public discourse at such locations.  This is obviously not true of
> streets continually filled with pulsing traffic.  Consequently, more so than with
> sidewalks or parks, courts have recognized a greater governmental interest in
> regulating the use of city streets. [Citation omitted.]

798 F.2d at 1266-67.[10]

Cases involving speech on highway medians are few and far between.  In *Snowden v.*

*Town of Bay Harbor Islands, Florida*, 358 F. Supp. 2d 1178 (S.D. Fla. 2004), the plaintiff

requested permission to place a Nativity scene on a grassy median dividing a state road.  When

the Town of Bay Harbor denied her request, she filed suit seeking declaratory and injunctive

relief.  In deciding the plaintiff's request for a preliminary injunction, the court undertook a

---

[10]  The *ACORN* court, however, found it unnecessary to decide whether public streets are
"perpetual public fora" because it found the ordinance justified even under the more rigorous
standards applied to regulation of expression in traditional public fora.  *Id.* at 1267.
Consequently, the court declined to express any opinion as to whether streets while
simultaneously in use by motor vehicles are traditional public fora.  *Id.*

forum analysis and concluded that the median on which plaintiff sought to erect her display was

**not** a traditional public forum, despite the plaintiff's characterization of it as such.  The court

reasoned:

> **It is not a traditional park or area where people congregate, gather, and traditionally have a free exchange of ideas and speakers, with appropriate accommodations facilitating such use, such as public restrooms and public parking.** This grassy area is more appropriately what Defendants have represented it to be, a rather small green space abutting two roadways, with no buffers such as sidewalks for protection or apparent invitation to the public.  It does not present the physical characteristics of a park beyond the presence of grass, and is not associated with or near a seat of legislative or executive power. *Cf. Warren v. Fairfax County*, 196 F.3d 186 (4th Cir.1999).  **Although technically open to the public, it does not function as a traditional or "quintessential" public forum.** *See, e.g.,* [*United States v.*] *Kokinda*, 497 U.S. [720,] 728-29, 110 S.Ct. 3115 ("[T]he dissent is simply incorrect in asserting that every public sidewalk is a public forum. Post, at 3129-3130. As we recognized in [*United States v.*] *Grace*, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983) ], the location and purpose of a publicly owned sidewalk is critical to determining whether such a sidewalk constitutes a public forum.").

358 F. Supp. at 1193.

By contrast, in *Warren v. Fairfax County*, 196 F.3d 186 (4th Cir. 1999) (*en banc*), the

Court found that the Center Island mall in front of the Fairfax County Government Center

Complex was more of a park than a median as argued by the defendants (and as found by the

majority of the original appellate panel), and therefore, was a public forum.

> Sidewalks circumnavigated the mall and ran through a central landscaped strip. The area of the mall abutting the Government Center Complex features a circular brick promenade complemented by additional landscaping.  Surrounding the mall is the street which leads to the Government Center Complex.  The entire mall is outdoors, unenclosed, publicly accessible, and in fact open to the public.

*Id.* at 188.  From these features, the Court found that

> The Center Island mall has the objective use and purpose of a traditional public forum.  Its objective use is as a place of open public access, which is eminently compatible with expressive activity.

Finally the Center Island mall is part of a class of property which by history and tradition has been open and used for expressive activity. The Center Island mall is part of the outdoor grounds of a seat of legislative and/or executive power.

*Id*. at 189-90.[11]

---

[11]  Adopting the original appellate panel's dissenting opinion, the *Fairfax County en banc* court, however, stated in dicta, that even if it were to agree with the original panel's majority determination that the Center Island mall was only a landscaped median, it would disagree with the majority's conclusion that median strips should not be viewed as traditional public fora, stating:

Neither the district court nor the majority cited to any authority supporting their novel attempt to carve out an exception from the public forum doctrine for property that, quite literally, lies at the heart of the Supreme Court's quintessential example of the traditional public forum. If streets, sidewalks and parks are traditional public fora, then a court bears a heavy burden in explaining why property which is merely a combination of all three from the standpoint of physical characteristics, objective uses and purposes, and traditional and historic treatment, is not. Median strips, like sidewalks, are integral parts of the public thoroughfares that constitute the traditional public fora. In many cases, median strips house sidewalks. If a person who is rightfully on a street or sidewalk left open to the public "carries with him there as elsewhere the constitutional right to express his views in an orderly fashion," *Jamison v. Texas*, 318 U.S. 413, 416, 63 S.Ct. 669, 87 L.Ed. 869 (1943), I do not see how the person loses that right merely by stepping onto the median. Nor does the general public. Consistent with the median strip's function as part of the public thoroughfares traditionally open to the public for expressive activities, people have been engaging in such activity on median strips for as long as median strips have been in existence. Newspaper criers, local civic fundraisers, members of political campaigns, religious groups, and people with a message have often chosen median strips, with their ready access to the bustle of undifferentiated humanity, as their preferred launching point for expressive conduct.

196 F.3d at 196 (footnote omitted.)

The *en banc* court, however, excepted from its "public forum" view of medians median strips on interstates and similarly cordoned off expressways, which by their nature are not generally accessible to pedestrians. The Center Island mall is not such a median strip as evidenced by the sidewalks around its circumference.

*Id*. at n. 9.

As these cases reflect, there are few clear lines of demarcation in cases in which streets, medians and vehicular traffic coincide to create a potential conflict between free speech interests and public safety concerns.  Therefore, the Court must turn to consideration of the various factors distilled from the cases in deciding whether the Mound Road median at issue should be deemed to be a public or non-public forum.  These factors may be synthesized as follows:  (1) the median's physical characteristics and the context of the property's use, including its location and purpose; (2) the County's intent in constructing the median and its need for controlling expressive activities on the property, as evidenced by its policies or regulations; and (3) whether the property in question is part of a class of property which by history or tradition has been open and used for expressive activity.

The Mound Road median is 60 feet wide and is located in the center of a major eight-lane roadway with traffic at times reaching relatively high rates of speed, and with a busy intersection.  More than 82,600 cars travel the road each day at speeds of 50 miles per hour or greater.  The median at issue has only one sidewalk.  This sidewalk located at the median's north end aligns with crosswalks on the east and west side of the median for pedestrian crossing of Mound Road.  On the middle of the median, some distance away from the sidewalk and separated by a stand of trees is a permanent display denoting the original village character of the City of Warren.  This display, which consists of some antique farm instruments and a couple of benches, was installed by the "Friends of the Village", an organization that raised funds for the Warren Historical Commission," to compliment the Michigan "Historic Site" marker on the median north of the Chicago Road intersection which was placed there permanently by the State

30

of Michigan in 1982[12].  The median, however, was not constructed as a gathering place but for the purpose of controlling traffic on Mound Road.  And, as indicated, though it is situated in the center of a public street, the median, itself, is not among the classes of property which by history or tradition have been open and used for expressive activity.

Viewed in its totality, the subject median cannot be a place intended for bringing citizens together to exchange ideas, which, of course, is at the core of the "public forum" designation.  A traditional public forum is a public place where, by long history, the public has gathered to speak, debate, and exchange ideas.  *See Perry Educ. Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954.  It is those "'[p]ublic places' historically associated with free exercise of expressive activities, such as streets, sidewalks and parks, that are considered, without more, to be 'public forums.'"  *United States v. Grace*, 461 U.S. 171, 177, 103 S.Ct. 1702, 1707 (1983); *see also Frisby v. Schultz,* 487 U.S. 474, 108 S.Ct. 2495 (1988) (holding in the context of picketing on a matter of public concern that residential streets are traditional public fora.  "[U]ninhibited, robust and wide-open debate on public issues" strikes "at the core of the First Amendment."  *Id.* at 479, 108 S.Ct. at 2499).  Such places are considered traditional public fora because they "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens and discussing public questions."  *Perry*, 460 U.S. at 45, 103 S.Ct. at 954.  Indeed, the Supreme Court "has rejected the view that traditional public forum status extends beyond its historical confines." *Arkansas Educ. Television Ass'n v. Forbes*, 523 U.S. 666, 668, 118 S.Ct. 1633, 1641 (1998).

---

[12] *See* www.michmarkers.com.  *See also* Hoepfner Aff., ¶ 33.

It cannot be said that the median on which Plaintiff wants to set up his display is used for public discourse and debate such as Capitol Square is in Columbus, Ohio, which has long been used for public gatherings and cultural festivals, *see Capitol Square Review and Advisory Bd. v. Pinette,* 515 U.S. 753, 115 S.Ct. 2440 (1995) (permitting display of a cross in a square in front of the Ohio statehouse which has long been used for public gatherings and cultural festivals and during the holiday season, is decorated with lights, a Christmas tree and a menorah), or Calder Plaza in Grand Rapids, Michigan, *see Americans United for Separation of Church and State v. City of Grand Rapids*, 980 F.2d 1538 (6th Cir. 1992) (permitting private organization's display of Menorah on a plaza used for all forms of speech and assemblage). Nor is the median property that the City of Warren or Macomb County has dedicated to commemorating the "people, ideals, and events that compose [the city's or county's] identity" such as the park surrounding the Texas State Capitol, addressed in *Van Orden v. Perry*, 545 U.S. 677, 125 S.Ct. 2854 (2005) (upholding display of the Ten Commandments as one of 17 monuments on the 22-acre park surrounding the Texas State Capitol).

When public property is not characterized as a public forum, the government may reserve the forum for its intended purposes. *Perry Educational Ass'n, supra*, 460 U.S. at 46, 103 S.Ct. at 955; *Adderley v. Florida*, 385 U.S. 39. 47, 87 S.Ct. 242, 247 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."). Restrictions on speech in nonpublic fora are valid if they are "reasonable" and not an effort to suppress expression merely because public officials oppose the speaker's view. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. at 806, 105 S.Ct. at 3451. Restrictions on speech in nonpublic fora are reasonable when they are "consistent with

32

the [government's] legitimate interest in 'preserv[ing] the property. . . for the use to which it is lawfully dedicated." *Perry*, 460 U.S. at 50-51, 103 S.Ct. at 958. "The Government's decision to restrict access to a nonpublic forum need only be reasonable; it need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808, 105 S.Ct. at 3452. "Nor is there a requirement that the restriction be narrowly tailored or that the Government's interest be compelling." *Id*. at 809, 105 S.Ct. at 3452. In fact, simple common sense is sufficient to uphold a regulation under reasonableness review. *United States v. Kokinda*, 497 U.S. 720, 734, 110 S.Ct. 3115, 3124 (1990).

Here, Defendants justify denying Plaintiff a permit to erect his Nativity scene on the median based on concerns for vehicular traffic safety. Concern for public safety constitutes a reasonable, viewpoint neutral reason for excluding speakers from a nonpublic forum. *See e.g., United Food & Comm'l Workers Local 1099 v. Sidney*, 364 F.3d 738, 750-51 (6th Cir. 2004); *Jacobsen v. Dept, of Transportation*, 450 F.3d 778, 780 (8th Cir. 2006); *Anderson v. Milwaukee County*, 433 F.3d 975, 980 (7th Cir. 2006). The Court confirmed this potential traffic safety hazard in its own site visit. (*See* more detailed analysis below.)

Defendants having propounded a reasonable, viewpoint neutral reason for denying Plaintiff a permit to erect his Nativity scene in a nonpublic forum, the Court finds no abridgment of Plaintiff's First Amendment right to freedom of speech.

33

2.      Even If the Median Is Viewed as a Public Forum, Defendants Have Demonstrated a
        Compelling State Interest for Denying Plaintiff a Permit

Even if the Court were to determine that the Mound Road median is a public forum, the

Court finds that Defendants' decision is justified even under the strict scrutiny standards applied

to the regulation of speech in traditional public fora.

Government entities are strictly limited in their ability to regulate private speech in

traditional public fora. *Pleasant Grove, supra*, 355 U.S. at ___, 129 S.Ct. at 1132; *Cornelius v.

NAACP Legal Defense & Ed. Fund, Inc*., 473 U.S. at 800, 105 S.Ct. at 3448.   Although

reasonable time, place, and manner restrictions are allowed, see *Perry Ed. Assn., supra*, 460 U.S.

at 45, 103 S.Ct. at 955, any restriction based on the content of the speech must satisfy strict

scrutiny, that is, the restriction must be narrowly tailored to serve a compelling government

interest, *see Cornelius, supra*, 473 U.S. at 800, 105 S.Ct. at 3448, and restrictions based on

viewpoint are prohibited, *see Carey v. Brown*, 447 U.S. 455, 463, 100 S.Ct. 2286, 2291 (1980).[13]

Defendants maintain that they had a compelling state interest in denying Plaintiff's

application for a permit for his temporary Nativity display, that interest being to keep the county

roads safe for vehicular travel.[14]   In furtherance of this interest, the Road Commission's policy is

---

[13] These same standards apply to "limited" or "designated"  public fora.  *Pleasant Grove
v. Summum,* 355 U.S. at ___,129 S.Ct. at 1132; *Perry Educational Ass'n*, 460 U.S. at 45, 103
S.Ct. at 955.


[14]   As indicated above, Defendants did not give Plaintiff traffic safety as a reason in its
"formal denial" of his permit.  Defendants, however, have presented evidence -- which Plaintiff
has not rebutted -- that they had already decided that Plaintiff's crèche posed a traffic safety
hazard at the time they sent him the denial letter but only addressed in the letter the violation of
the First Amendment's Establishment Clause they believed would result if they granted the
permit because Plaintiff had focused on his First Amendment rights in submitting his
application.

34

to prohibit the installation of private structures and encroachments in the medians of primary roads and major highways. Mr. Hoepfner testified in his deposition that he had determined that, as an encroachment within the Mound Road right-of-way, the installation of the Nativity scene in the median would be unsafe: "It's an obstruction and encroachment within our right of way. . . ." Hoepfner Dep., p. 32. Hoepfner further testified that he believed that the intended location of the crèche would violate specific regulations set forth in the Michigan Road Design Manual and the Road Commission's Subdivision Development Procedures, Standards and Specifications for clear zone and sight distance. *Id.* at 33. Hoepfner, however, admitted he did not deny the application simply for sight problems, but rather because the intended display was an encroachment and had a structure that he thought was unsafe. *Id.* at 35. He further testified that he believed he had enough information at the time he reviewed the permit application to make his decision. *Id.* at 114. Furthermore, the Michigan Road Design Manual suggests that "virtually everyone agrees that a flat, smooth unobstructed area adjacent to driving lanes is highly desirable and significantly improves highway safety." *See* Defendants' Ex. G at Reg. 7.01.11. Taking this regulation into consideration while reviewing Plaintiff's permit application and the photographs appended to it, Mr. Hoepfner made the decision that Plaintiff's crèche was unsafe. Hoepfner Dep. at 114.

Defendants' expert, Dr. William C. Taylor, Ph.D., has opined that while "the placement of the crèche as requested will not increase the hazard to motorists when all drivers obey the traffic control devices. . ., it will increase the hazard for a defensive driver approaching the intersection on Chicago Road from the west when a driver runs a red light while traveling on [northbound] Mound Road." Taylor Report, Defendants' Ex. C. According to Dr. Taylor, the

35

visibility obstruction created by the crèche becomes problematic when the eastbound Chicago

Road driver approaches the intersection between the speed of 18 mph and 24 mph and looks over

to the oncoming northbound Mound Road traffic.  *Id.  See also* Taylor Dep., pp. 23-36, 47-51.

The sight line impediment lasts for a period of at least a second, so if the driver does not look

over again while approaching or driving through the intersection, and thus, not alerted to an

oncoming Mound Road driver traveling at 30-60 miles per hour who runs a red light, the crèche

creates a potentially serious safety hazard.  *Id.*

      Plaintiff's expert, Dr. John F. Wiechel, Ph.D., concurred with Dr. Taylor to the extent

that

> If traffic is approaching [the Mound Road intersection] eastbound on Chicago
> Road, there is the possibility that a driver traveling in this direction who is not
> obeying traffic signals may not be able to identify the presence of northbound
> traffic on Mound Road in time to respond to that traffic.  In that case, any
> visibility obstructions may impede this driver's ability to perceive traffic on
> Mound Road. . . .  The crèche can also be a visibility obstruction in this situation.

Wiechel Report, Plaintiff's Ex. E, p. 6.[15]

      Plaintiff attempts to discredit Defendants' argument that safety was the reason for the

denial of Plaintiff's permit by arguing that the Affidavits given by Hoepfner and Fran Gillett in

opposing Plaintiff's Motion for Preliminary Injunction are contradicted by transcript of the Road

Commissioners' meeting of March 6, 2009.  According to Plaintiff,  Hoepfner and Gillett

indicated in their Affidavits that the Board authorized the denial of Plaintiff's permit at that

---

[15]  After making a personal site visit in connection with Plaintiff's Motion for Preliminary
Injunction, the Court, too, concluded that Plaintiff's crèche could present a visual obstruction to
motorists driving east-bound on Chicago Road of traffic traveling north-bound on Mound Road
causing a potential, but serious safety hazard.  *See* Opinion and Order Denying Plaintiff's
Motion for Preliminary Injunction, Dkt. # 24, *Satawa v. Bd. of  County Road Com'rs of Macomb
County*, 687 F. Supp. 2d at 700.

meeting and since the transcript shows that Hoepfner merely informed the Board of Plaintiff's permit at that meeting and never sought -- nor was given -- any express authorization to deny it, the Court must conclude that Hoepfner and Gillett lied when they stated in their Affidavits: "John Satawa's permit to install his nativity scene in the Mound Road right of way was addressed with the Board during the March 6, 2009 RCMC Board Meeting, and the Board authorized Mr. Hoepfner to deny the permit based on RCMC policies and safety concerns." [Gillett Aff. ¶ 9*; see also* Hoepfner Aff., ¶ 26 ( "Mr. Satawa's permit was addressed with the Board during the March 6, 2009 RCMC Board Meeting, and I was authorized by the Board to deny the permit based on RCMP policies and safety concerns.)]  Plaintiff apparently ignores the fact that there are two independent clauses in Paragraph 26 of Hoepfner's (and Paragraph 9 of Gillett's) Affidavit -- (1)  Mr. Satawa's permit was addressed with the Board during the March 6, 2009 Board meeting; and (2) the Board authorized Mr. Hoepfner to deny the permit based on RCMC policies and safety concerns.  Nothing in either Hoepfner's or Gillett's Affidavit states that the Board explicitly authorized the denial of the permit *at* the March 6 meeting.  Therefore, there is nothing untruthful in Hoepfner's and Gillett's affidavits.

The meeting transcript certainly bears out that Mr. Satawa's permit "was addressed with the Board during the March 6, 2009 RCMC Board Meeting."  *See* 3/6/09 Tr., Plaintiff's Ex. 24. As for Board authorization, as Fran Gillett testified, permit approval is not a matter handled by the Board.  "It would... go[] through the administrative process... the highway engineer and the permit department."  [Gillett Dep., pp. 33-34.]  Indeed, whether a permit is approved or disapproved by Hoepfner and the permit department would not normally even be brought to the Board's attention.  *Id*. at 35.   And, although the Board had the authority to override Hoepfner's

37

decision, [Hoepfner Dep., 41], the Board did not do that on March 6, 2009. *Id.* Rather, Hoepfner was authorized to proceed according to the law. [Gillett Dep., pp. 35-36; *see also* 3/6/09 Meeting Tr., Plaintiff's Ex. 24.] Mr. Hoepfner testified that he did not go to the Board seeking the Board's authorization; he only went to the Board with Satawa's permit to inform the Board that he was going to be denying the permit because he knew "they're liable to hear about it." [Hoepfner Dep., pp. 39, 42.]

To the extent that Plaintiff suggests that safety of Mr. Satawa's display was never an issue raised by Hoepfner with the Board in considering Satawa's permit application, Hoepfner's deposition testimony also dispels any such notion. Mr. Hoepfner's uncontradicted deposition testimony was that "many, many hours" were spent reviewing Mr. Satawa's permit application and that he had numerous discussions with the Board members prior to the March 6 Board meeting during the course of day-to-day business about Satawa's display. [Hoepfner Dep. p. 106-07.] He further testified that during these discussions, he expressed his concerns about the safety of the display being erected on the Mound Road median and recommended that Mr. Satawa's permit not be approved based on those concerns, and the Board members concurred in that recommendation. *Id.* at 107. Fran Gillett also testified that there were discussions in the hall and in her office with Hoepfner about the safety concerns raised by Mr. Satawa's proposed display and that safety was Hoepfner's main concern. [Gillett Dep. pp. 31, 78-9.]

In sum, the Court does not find that Plaintiff has demonstrated the existence of any material issue of fact with regard to Defendants' safety reasons for the denial of Mr. Satawa's permit application such that the safety reasons given by Mr. Hoepfner should be discredited.

"As a general matter, it is clear that a State's interest in protecting the 'safety and

38

convenience' of persons using a public forum is a valid governmental objective."  *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 650, 101 S.Ct. 2559, 2565 (1981); *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376, 117 S.Ct. 855, 866 (1997); *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009), *cert. denied*, 130 S.Ct. 1569 (2010) (recognizing "a somewhat greater governmental interest in regulating expressive activity on city streets because of the public safety concerns raised by vehicular traffic.").  As this Court previously observed, "even where, as here, the safety hazard exists only in limited circumstances, the potential for even one tragic accident at a busy intersection clearly constitutes a compelling interest which the State must address."  *Satawa v. Bd. of  County Road Com'rs*, 687 F. Supp. 2d at 700.

Further supporting, and extending, this legitimate concern, as Mr. Hoepfner testified, if the Road Commission allowed the installation of Mr. Satawa's private structure in the Mound Road median, it could set a dangerous precedent in the future because other people would demand permission to install all kinds of private installations of all shapes and sizes in medians all over Macomb County, thereby creating safety hazards all over the county.  [*See* Hoepfner Dep., p. 117.]  Courts may consider the cumulative impact if many others decided to engage in similar conduct.  *See Heffron*, 452 U.S. at 652-54, 101 S.Ct. at 2566-67; *see also ACORN v. City of Phoenix, supra*, 798 F.2d at 1270.

For all of these reasons, the Court finds that Defendants have demonstrated a compelling governmental interest that is significant and legitimate to justify the decision to deny Plaintiff a permit to erect his Nativity display in the Mound Road median.

3.     The Restriction on Plaintiff's Speech Was Narrowly-Tailored to Address Legitimate
       Traffic Safety Concerns.

Finally, the Court turns to the question of whether the restriction on Plaintiff's religious speech was "narrowly tailored" to address legitimate traffic safety concerns. A restriction may be narrowly tailored for First Amendment purposes even if it restricts more speech or conduct than is absolutely necessary. *See Hill v. Colorado*, 530 U.S. 703, 726, 120 S.Ct. 2480, 2494 (2000) ("when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal"); *Ward v. Rock Against Racism*, 491 U.S. 781, 798, 109 S.Ct. 2746, 2757 (1989) (holding that a content-neutral regulation of protected speech must be narrowly-tailored "but it need not be the least restrictive or least intrusive means of doing so.")

It is important to note here that the Defendants' action in denying Plaintiff a permit to erect his Nativity display in the Mound Road median does not leave Plaintiff without any comparable viable site for his expression, since, as Mr. Satawa admitted in his deposition, St. Anne's Church just a few hundred yards from the proposed median site offered to permit a prominent display of the crèche on Mound Road and with virtually no public safety implications, as it did in past years when it was not possible for Plaintiff to display the crèche in this median. [Satawa Dep. p. 55.] In addition, 9 or 10 other business and property owners along this same section of Mound Road made the same offer, including Lyle Elliot Funeral Home, Gazebo Banquet Center, St. Paul's Lutheran Church, the K of C Council and several individuals. *Id.*

For all of the foregoing reasons, the Court concludes that Plaintiff has failed to make out a claim of violation of his First Amendment right to freedom of speech. Therefore, summary

40

judgment will be entered in favor of Defendants on Count I of Plaintiff's Complaint.

D.      PLAINTIFF'S ESTABLISHMENT CLAUSE CLAIM

In Count II of Plaintiff's Complaint, Plaintiff asserts a claim of a violation of the Establishment Clause.

The Establishment Clause of the First Amendment to the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion. . . ." Neutrality is the fundamental requirement of the Establishment Clause, which prohibits the government from either endorsing a particular religion or promoting religion generally. *See Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 703, 114 S.Ct. 2481, 2491(1994) ("[A] principle at the heart of the Establishment Clause [is] that government should not prefer one religion to another, or religion to irreligion."); *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another."); *Gillette v. United States*, 401 U.S. 437, 450, 91 S.Ct. 828, 836 (1971) ("[T]he Establishment Clause prohibits government from abandoning secular purposes to favor the adherents of any sect or religious organization.")

In *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105 (1971), the Supreme Court articulated a three-prong test to determine whether a statute or governmental action violates the Establishment Clause.[16]  In order to pass muster under the *Lemon* test, the government's action

---

[16]  Although the Supreme Court has articulated other tests in certain particular contexts (*e.g.,* the "endorsement" test, *see Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086 (1989), and the "coercion" test, *see Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649 (1992)), the Sixth Circuit expressly has determined that, other than in aid-to-education cases, the rule that this Circuit will adhere to is the traditional *Lemon* analysis.  *See ACLU v. Mercer County*, 432 F.3d 624, 635 (6th Cir. 2005); *see also Hansen v. Ann Arbor Public Schools*, 293 F. Supp.2d 780, 804 n.28 (E.D. Mich. 2003).

must satisfy all of these three criteria: (1) the government's action must have a secular purpose; (2) its principal and primary effect must be one that neither advances nor inhibits religion; and (3) it must not foster excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-13, 91 S.Ct. at 2111. The first and second prongs have since been reformulated. After *McCreary County v. ACLU*, 545 U.S. 844, 125 S.Ct. 2722 (2005), the first is now a "predominant purpose" test. *McCreary County*, 125 S.Ct. at 2733; *id*. at 2757 (Scalia, J., dissenting) ("[T]he [*McCreary County* majority] replaces Lemon's requirement that the government have 'a secular . . . purpose' with the heightened requirement that the secular purpose 'predominate' over any purpose to advance religion." (quoting *Lemon*, 403 U.S. at 612, 91 S.Ct. 2105)). As such, a religious purpose alone is not enough to motivate a governmental act, but the secular purpose must predominate. *See Wallace v. Jaffree*, 472 U.S. 38, 56, 105 S.Ct. 2479, 2489 (1986); *Lynch v. Donnelly*, 465 U.S. 668, 681 n. 6, 104 S.Ct. 1355, 1363 n. 6 (1984).

In order to determine whether a secular purpose exists, courts analyze the government's stated intent for the disputed law or practice. *Snowden v. Town of Bay Harbor Islands, supra*, 358 F. Supp. at 1197 (citing *King v. Richmond County, Georgia*, 331 F.3d 1271, 1276 (11th Cir. 2003)). If there is no evidence of the government's intent at the time for the practice, then the government may propose a possible secular purpose later. *Id.*

As indicated above, Defendants have stated that the purpose of their policy and, in particular, their denial of Plaintiff's application for a permit to erect his Nativity scene is/was a secular one -- to maintain traffic safety. Additionally, Defendants' avoidance of an Establishment Clause violation is a "secular purpose." "Actions taken to avoid potential

42

Establishment Clause violations have a secular purpose under the *Lemon* test."  *See Stratechuk v. Bd. of Ed., South Maplewood School Dist.*, 587 F.3d 597, 604 (3rd Cir. 2009), *cert. denied*, 131 S.Ct. 72 (2010); *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1255 (9th Cir.), *cert. denied*, 552 U.S. 1062 (2007); *Roberts v. Madigan*, 921 F.2d 1047, 1054 (10th Cir.1990), *cert. denied*, 505 U.S. 1218 (1992).  The Supreme Court has generally granted a government's stated purpose a great deal of deference, *see e.g., Committee for Public Education v. Nyquist*, 413 U.S. 756, 773, 93 S.Ct. 2955, 2966 (1973); *Lemon v. Kurtzman*, 403 U.S. at 613, 91 S.Ct. at 2111, and will not lightly attribute unconstitutional motives to the government particularly where a plausible secular purpose can be discerned.  *Wallace v. Jaffree*, 472 U.S. at 74-75, 105 S.Ct. at 2499-2500; *Mueller v. Allen*, 493 U.S. 388, 394-95, 103 S.Ct. 3062, 3066-67 (1983).  Nor can the Court say that the secular purpose advanced by Defendants is so implausible that they must have actually been motivated by a religious purpose.  *American Atheists v. Davenport*, ___ F.3d ___, 2010 WL 5151630 at * 18 (10th Cir., Dec. 20, 2010) (*en banc*).

Turning to the *Lemon* test's effect prong, the "principal or primary effect" of the challenged policy or practice, this prong asks "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval" of religion.  *Lynch v. Donnelly, supra*, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J. concurring).  "While an adjudication of [a policy's] effect must take into account the perspective of one who is neither Christian nor Jewish, as well as of those who adhere to neither of these religions, the constitutionality of its effect must also be judged according to the standard of a 'reasonable observer.'"  *County of Allegheny v. ACLU*, 492 U.S. at 620, 109 S.Ct, at 3115.  A reasonable observer here would not find that the Road Commission's policy of not permitting the

43

placement of temporary structures in the medians of major roadways conveys a message of endorsement or disapproval of religion.

The final prong of the *Lemon* test considers whether the challenged policy or practice "foster[s] an excessive government entanglement with religion." No such entanglement can be found in this case.

For all of the foregoing reasons, the Court concludes that Defendants' denial of Plaintiff's application to display a Nativity scene during the Christmas season on the Mound Road median did not violate the Establishment Clause.[17] Therefore, summary judgment will be entered in favor of Defendants on Count II of Plaintiff's Complaint.

E.   PLAINTIFF'S EQUAL PROTECTION CLAIM

In Count III of his Complaint, Plaintiff challenges the denial of the permit to erect his Nativity display on the Mound Road median on Equal Protection grounds.  He claims that Defendants' action violates the Equal Protection Clause of the Fourteenth Amendment because it has allowed the Village of Warren Historical Commission's to erect a gazebo as part of its permanent display on the median just north of Chicago Road and that gazebo poses the same safety concerns as his crèche.

The Equal Protection Clause protects against arbitrary classifications, and requires that similarly situated persons be treated equally. *See* U.S. Const. Amend. XIV; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254 (1985). To withstand Fourteenth Amendment scrutiny, government actions that do not interfere with fundamental rights or single

_____

[17]  The Court intends no opinion, either express or implied, as to whether in the absence of the public safety risk it posed, the display of the crèche constituted a violation of the Establishment Clause.

out suspect classifications must bear only a rational relationship to a legitimate state interest. *See City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254.  Plaintiff argues that Defendants' actions here,  should be subject to "strict scrutiny."  However, under equal protection analysis, strict scrutiny is only applied if there is an infringement of a fundamental right or discrimination against a suspect class.  "If a protected class or fundamental right is involved, this Court must apply strict scrutiny, but where no suspect class or fundamental right is implicated, this Court must apply rational basis review."  *Midkiff v. Adams County Regional Water District*, 409 F.3d 758, 770 (6th Cir.2005) (citing *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir.2000)).

    Plaintiff here contends that strict scrutiny applies because Defendants' actions infringe on First Amendment rights.  However, because the Court has already determined that Plaintiff does not have a meritorious Free Speech or Establishment Clause claim, his Equal Protection claim is subject only to rational basis scrutiny.  *See Teen Ranch, Inc. v. Udow*, 389 F. Supp. 2d 827, 841 (W.D. Mich. 2005), *aff'd* 479 F.3d 403 (6th Cir.), *cert. denied*, 552 U.S. 1039 (2007) ; *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 231 (2d Cir.1996) (where the plaintiffs have failed to show a violation of the First Amendment, strict scrutiny is inapplicable and the challenged statute is evaluated under rational basis review); *see also Johnson v. Robison,* 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 1170 n. 14 (1974) ("Since we hold that the Act does not violate appellee's right of free exercise of religion, we have no occasion to apply to the challenged classification a standard of scrutiny stricter than the traditional rational-basis test");  *Locke v. Davey*, 540 U.S. 712, 721 n. 3, 124 S.Ct. 1307, 1313 n. 3 (2004)  (where a plaintiff's First Amendment Free Exercise claim has failed, only rational basis scrutiny applies in subsequent review of an equal protection fundamental right to religious free exercise claim based on the same facts); *Wirzburger v.*

*Galvin*, 412 F.3d 271, 282-83 (1st Cir. 2005), *cert. denied*, 546 U.S. 1150 (2006) (same).

Under a rational basis analysis, "a statutory classification that neither proceeds along suspect lines nor infringes constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Bowman v. United States*, 564 F.3d 765, 775-76 (6th Cir. 2008), *cert. denied,* 130 U.S. 55 (2009) (citing *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101 (1993).)  The question under the rational basis test is "whether the regulation at issue is 'rationally related to legitimate government interests.'" *Id.*  "[C]ourts hold statutes unconstitutional under this standard of review only in rare or exceptional circumstances." *Id.* All that is required is that a classification be "reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation and that all persons similarly circumstanced be treated alike." *Id.*

As indicated above, the Defendants denied Plaintiff a permit for the erection of his Nativity display in the interest of insuring the safety of vehicular traffic.  And, as indicated, public safety is a valid governmental objective.  *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, *supra*; *Schenck v. Pro-Choice Network of W. N.Y.*, *supra*; *Long Beach Area Peace Network v. City of Long Beach*, *supra*.

Relying solely upon Defendant Hoepfner's statement in his deposition that, like Mr. Satawa's crèche, he viewed the gazebo as an encroachment in the County's right-of-way, Plaintiff argues that the dissimilar treatment afforded him and his crèche is discriminatory, the latter structure being allowed to remain in the median while his structure was not.  However, in making this argument, Plaintiff overlooks the dissimilarities between the two structures.

46

Unlike Plaintiff's home-made crèche for which Plaintiff sought a permit to temporarily display during the Christmas season, the gazebo is a *permanent* structure that was installed in compliance with all adequate safety measures and all necessary permits, *see* Hoepfner Aff., ¶ 34, and is insured by a $5 million insurance policy held by the City of Warren, which names the Road Commission as an additional insured.  *See* Defendants' TRO Ex. I.  Furthermore, the Court's observation was that the gazebo is situated and structured in such a way that visibility of south-bound Mound Road traffic is not obscured if one is traveling west-bound on Chicago Road through the signal-controlled intersection, *see Satawa v. Bd. of  County Road Com'rs of Macomb County*, 687 F. Supp. 2d at 687, and Plaintiff has not presented evidence to the contrary. Conversely, both Defendants' expert and Plaintiff's expert, as well as the Court, found that Plaintiff's crèche could present a visibility obstruction that would impede the view of a driver proceeding eastbound on Chicago Road of oncoming northbound Mound Road traffic. Defendants' denial of a permit to erect the crèche is rationally-related to eliminating this potential safety hazard.  Accordingly, the Court finds no legal merit in Plaintiff's Equal Protection claim.

CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment **[Dkt. # 41]** is GRANTED and Plaintiff's Motion for Summary Judgment **[Dkt. # 37]** is DENIED. Accordingly,

47

IT IS FURTHER ORDERED that this case be DISMISSED, in its entirety, WITH

PREJUDICE.

                                   s/Gerald E. Rosen
                                   Chief Judge, United States District Court

Dated:  April 19, 2011

I hereby certify that a copy of the foregoing document was served upon counsel of record on
April 19, 2011, by electronic and/or ordinary mail.

                                   s/Ruth A. Gunther
                                   Case Manager